**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COUNCIL FOR OPPORTUNITY IN EDUCATION**, 1025 Vermont Avenue NW, Suite 400, Washington, D.C. 20005,<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF EDUCATION and LINDA MCMAHON**, 400 Maryland Avenue, SW, Washington, D.C. 20202<br><br>Defendants. | Case No. <u>25-cv-3491</u> |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF**

Plaintiff Council for Opportunity in Education ("**COE**") brings this Complaint for Declaratory, Injunctive, and Mandamus Relief against Defendants the U.S. Department of Education ("**the Department**" or "**ED**") and Linda McMahon in her official capacity as the U.S. Secretary of Education (the "**Secretary**").[1] COE is concurrently filing a Motion for Preliminary Injunction.

---

[1] This Complaint refers to the Department and the Secretary collectively as "the Department" unless specified otherwise.

## PRELIMINARY STATEMENT

This case involves the Department's ill-reasoned and procedurally deficient denial of federal education grants that help low-income, first-generation college students, and students with disabilities. The Department solicited applications for the grants in spring 2024, the prospective grantees applied in summer 2024, and the Department in summer 2025 denied their applications. The Department denied them based on language in their applications that conflicted with the Trump Administration's new anti-DEI policies. But the applications addressed the Biden-era Department's DEI-related prompts from 2024, and contained statements about equity that are required by federal law. The Department's retroactive application of new policies, and its actions penalizing applicants for responding to its prompts and making statutorily-required statements about equity are deeply unfair and lie at the heart of this case.

At issue is the federal Student Support Services ("**SSS**") grant program. The program is statutorily authorized under the Higher Education Act of 1965 ("**HEA**") and is administered by the Department of Education and its Secretary. *See* 20 U.S.C. §§ 1070a-11 & a-14. Congress created the SSS program in the 1960s and has consistently funded it ever since. The Department awards five-year SSS grants to postsecondary educational institutions, which rely on the grants to operate projects providing academic assistance and critical educational support services to low-income students, first-generation college students, and students with disabilities, to help them earn a college degree. The program is remarkably successful: in 2024 alone, SSS served more than 200,000 students enrolled at postsecondary institutions.

In spring 2024 the Biden-era Department published a notice inviting applications for new SSS grants. The notice encouraged applicants to address the Biden-era Department's "priorities" for awarding grants to applicants whose proposed SSS projects would best meet the educational

needs of "underserved" students, including "students of color," and that were best designed to make college more affordable and accessible to these students. Applicants best meeting these priorities would earn bonus points on their score, increasing the likelihood of receiving a new grant.

Additionally, federal law required all applicants to ensure "equity" in their SSS projects. Applicants specifically had to address the steps they would take to meet the special needs of students to overcome barriers to equitable participation, including barriers based on race, color, and other characteristics. *See* 20 U.S.C. § 1228a(b) ("**GEPA Equity Directive**").

The Department asked in 2024, and the applicants answered in 2024. Yet when it came time to award new grants in 2025, the Department—now under the Trump Administration—rejected applications that best addressed the priorities in the 2024 notice, that contained language the GEPA Equity Directive required, or that otherwise ran afoul of the current Administration's policies against diversity, equity, and inclusion ("**DEI**"). Their applications, in the Department's view, had indicated they would "take account of race in ways that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law," including Title VI of the Civil Rights Act of 1964 ("**Title VI**").

The Department's actions are unlawful for many reasons, and the first one is obvious: the Department rejected applications for saying what they were supposed to say. Having both responded to the 2024 notice's priorities and supplied the statutorily-required GEPA Equity Directive, but now being rejected for doing so, the applicants are caught between two Administrations' very different views on the same topic.

The second, related reason is that the Department invoked the Trump Administration's new

- 3 -

policies as a basis for denying applications without following the process to formalize them. Executive agencies certainly have freedom to change their positions, but not on a whim. Federal law, unique to the Department, requires it undergo notice-and-comment rulemaking to set new "priorities"—or to discard existing priorities—to use when making grants. In fact, the Department recently initiated a rulemaking process in May 2025 by proposing new priorities to use in future grant competitions and to rescind the priorities it set under the Biden Administration. As part of that rulemaking process, the Department explicitly stated that it would use the existing (2021) priorities to evaluate previously-submitted applications for new grants, including the very priorities in the Department's 2024 notice. That statement would ring hollow just a few weeks later when the Department denied the applications for inconsistency with the Trump Administration's new anti-DEI policies.

The third critical way in which the Department broke the law is by failing to adhere to statutory procedures that apply when federal agencies deny funding based on Title VI race discrimination. The seriousness of such charges is matched—appropriately—by the strictness of Title IV's procedural protections. At a bare minimum, these procedures mandated that the Department seek the applicants' voluntary compliance with Title VI and hold a hearing *before* denying grants. The Department afforded none of these protections to any of the rejected applicants. Instead, the Department gave them boilerplate letters devoid of individual analysis.

The Department bypassed many other statutory and regulatory requirements, including several unique to the SSS program. These requirements include the Secretary's duty to award new grants based on peer reviewers' scores of an application, on the applicant's prior experience, and on the application's "merit"—and to do so in an "accurate" and "transparent" manner. Critically, those scores dictate the awarding of new grants. The Department, however, refused to give

applicants their scores and their peer-reviewed applications as required. By all appearances, it withheld this information precisely because the applicants scored high enough to receive grants but were not awarded them because of the Department's new policies. The Department's actions violate the carefully-constructed statutory processes for awarding new SSS grants. It has exercised discretion in a part of the grantmaking process that contemplates none, and it has kept from applicants the very evidence that proves it.

For these reasons and more, COE—whose members are the denied applicants—comes to this Court seeking relief. The Department's actions are contrary to law, in excess of statutory authority, arbitrary and capricious, and without observance of procedure required by law, all in violation of the federal Administrative Procedures Act ("**APA**"). No less so, the Department's actions violate core Constitutional principles and are *ultra vires*.

The Court should declare the Department's actions unlawful, immediately set aside the denial decisions, and direct the Department to reconsider immediately the denied Applications (as defined below), and award new grants in accordance with the final scores the Affected Programs (as defined below) already earned and by following a lawful process consistent with the HEA, Title VI, the applicable Department regulations, and the 2024 notice inviting applications. To the extent such relief is not available, the Court, at the very least, must require the Department to put the Affected Programs in the position they should be in when the next SSS grant competition is held.

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because this civil action arises under the Constitution of the United States and federal statutes. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1361, 2201–02, and 5 U.S.C. §§ 701–06.

2.      This Court further has jurisdiction pursuant to Title VI, which authorizes "judicial review" of agency action, including "terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d–1 of this title" through the APA. 42 U.S.C. § 2000d-2.

3.      This Court is authorized to issue the injunctive and declaratory relief sought herein under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, Federal Rules of Civil Procedure 57 and 65, the Court's inherent equitable powers, and under the APA, 5 U.S.C. §§ 702-704, 706.

4.      COE does not seek an order "to enforce a contractual obligation to pay money" as there is no existing contractual obligation. *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (citation omitted). The claims herein are not based on "any express or implied contract with the United States" as there is no existing express or implied contract. *Id.* (citing 28 U.S.C. § 1491(a)(1)). This Court properly has jurisdiction.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(C) because COE is a Washington D.C. nonprofit corporation and its principal place of business is located in Washington, D.C. Venue is also proper under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)(A) because the Department is an agency of the United States and the Secretary is an officer of the Department who is sued in her official capacity.

## PARTIES

6.      Plaintiff Council for Opportunity in Education is a national membership organization comprised of colleges, universities, and nonprofit community-based agencies that participate in one or more federal TRIO grant programs. SSS is one of the TRIO programs.

7.      A 501(c)(3) nonprofit organization established in 1981, COE is dedicated to furthering the expansion of educational opportunities for disabled, low-income, and first-

generation college students in the United States who are served by the SSS and other TRIO programs.

8.     COE's advocacy and support services extend to the recipients of, and participants in, all federal TRIO programs. COE provides numerous services to more than 3,400 TRIO projects nationwide at more than 1,000 member colleges, universities, and community-based agencies within its 10 regional associations and works in conjunction with them to help disadvantaged students enter college and graduate.

9.     Every year, TRIO programs help approximately 900,000 students progress through the academic pipeline, from high school, to college, and beyond. The academic and future successes of TRIO students is at the core of COE's mission.

10.     Among COE's members are colleges and universities that applied to the Department in 2024 for new SSS grants that were denied by the Department in 2025. These members and their individual SSS programs (the "**Affected Programs**") have been directly harmed by the Department's denial of their applications for new grants (the "**Applications**").

11.     Defendant the U.S. Department of Education is an executive agency of the U.S. Government. The Department's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

12.     Defendant Linda McMahon is the Secretary of the Department. COE sues the Secretary in her official capacity. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

# BACKGROUND

I. **The history of federal grant programs for education and the current state of TRIO programs**

   a. **Mid-20th century barriers for low-income Americans to enroll in postsecondary education and early attempts to increase access**

13.    In the last 125 years, Harry Truman is the only U.S. President who did not earn a postsecondary degree—whether from a trade school, community college, liberal arts university, or any other type of postsecondary educational institution.

14.    President Truman's experience led him to believe in the importance of postsecondary education, and specifically, in every young person having the *opportunity* to attend college if they wished, regardless of their individual resources to finance higher education.

15.    In 1946, President Truman formed a Presidential Commission on Higher Education. He charged the Commission, composed of civic and educational leaders, with "an examination of the functions of higher education in our democracy and the means by which they can best be performed." Letter from President Truman, Appointing Members to the National Commission on Higher Education (July 13, 1946) (available in the Public Papers of Harry S. Truman). President Truman specifically directed the Commission to address "ways and means of expanding educational opportunities for all able young people." *Id.*

16.    The Truman Commission returned 18 months later with a comprehensive six-volume report addressing all aspects of higher education in the United States. *See The President's Commission on Higher Education*, Higher Education for American Democracy (Dec. 11, 1947);[2]

---

[2] *Available at* https://ia801506.us.archive.org/25/items/in.ernet.dli.2015.89917/2015.89917.Higher-Education-For-American-Democracy-A-Report-Of-The-Presidents-Commission-On-Higher-Education-Vol-I---Vi_text.pdf.

*see also* Statement by the President Making Public a Report of the Commission on Higher Education (Dec. 15, 1947).

17.    The Truman Commission examined then-existing economic barriers to college and concluded "that the decision as to who shall go to college is at present influenced far too much by economic considerations." 2 *The President's Commission on Higher Education,* Higher Education for American Democracy, Equalizing and Expanding Individual Opportunity, at 16. The Truman Commission elaborated, stating:

> The old, comfortable idea that "any boy can get a college education who has it in him" simply is not true. Low family income, together with the rising costs of education, constitutes an almost impassable barrier to college education for many young people. For some, in fact, the barrier is raised so early in life that it prevents them from attending high school even when free public high schools exist near their homes.

*Id.* at 28.

18.    The Truman Commission determined that along with state and local actors, the federal government bore a responsibility to remedy the obstacles facing low-income students, and emphasized the equity arguments for improving college access, stating:

> It is the responsibility of the community, at the local, State, and National levels, to guarantee that financial barriers do not prevent any able and otherwise qualified young person from receiving the opportunity for higher education. There must be developed in this country the widespread realization that money expended for education is the wisest and soundest of investments in the national interest. The democratic community cannot tolerate a society based upon education for the well-to-do alone. If college opportunities are restricted to those in the higher income brackets, the way is open to the creation and perpetuation of a class society which has no place in the American way of life.

2 *The President's Commission on Higher Education,* Higher Education for American Democracy, Equalizing and Expanding Individual Opportunity, at 23.

19.     In its recommendations to President Truman, the Commission therefore called for increased and "immediate" federal spending for young, low-income students. "Of major importance is the establishment of a national system of scholarships (or individual grants in-aid) and fellowships which will guarantee that a greatly increased number of qualified young persons have a chance for full educational development." 2 *The President's Commission on Higher Education*, Higher Education for American Democracy, Equalizing and Expanding Individual Opportunity at 22.

20.     The federal government's efforts to eliminate these barriers did not come right away, however. In the decade after the Truman Commission produced its Report, the only major federal education initiative providing financial assistance was the Serviceman's Readjustment Act, commonly known as the G.I. Bill. *See* Servicemen's Readjustment Act of 1944, Pub. L. No. 78-346, 58 Stat. 284. The G.I. Bill, while significant in its own right, was limited to benefiting military veterans returning from World War II. *See* Tit. II, § 400, 58 Stat. at 287–88.

21.     Later, in response to the Soviet Union's launching of the Sputnik satellite and concerns that America was losing ground to the Soviets in the space race, President Dwight Eisenhower in 1958 signed into law legislation to fund scholarships for students studying in science and foreign languages, areas deemed critical to national defense. *See* National Defense Education Act of 1958, Pub. L. No. 85-864, 72 Stat. 1580. But this legislation had a similarly-limited impact on the goals laid out by the Truman Commission because aid benefitted students studying only some disciplines, such as science, mathematics, engineering, or a modern foreign language. *See* § 204, 72 Stat. at 1584.

22.     The Truman Commission's goals ultimately would not be realized in earnest until the 1960s.

23.    During his 1964 State of the Union address, President Lyndon B. Johnson "declare[d] unconditional war on poverty in America." Lyndon B. Johnson, State of the Union Address (Jan. 8, 1964). Two months later, President Johnson outlined his terms of engagement:

> I have called for a national war on poverty. Our objective: total victory. There are millions of Americans—one fifth of our people—who have not shared in the abundance which has been granted to most of us, and on whom the gates of opportunity have been closed.

See Lyndon B. Johnson, Special Message to the Congress Proposing a Nationwide War on the Sources of Poverty (Mar. 16, 1964).

24.    At the time of President Johnson's remarks, the United States had become a full-fledged superpower. But many Americans still remained in poverty. When Congress established the first grant program under the TRIO umbrella—Upward Bound—it stated:

> Although the economic well-being and prosperity of the United States have progressed to a level surpassing any achieved in world history, and although these benefits are widely shared throughout the Nation, poverty continues to be the lot of a substantial number of our people. The United States can achieve its full economic and social potential as a nation only if every individual has the opportunity to contribute to the full extent of his capabilities and to participate in the workings of our society. It is, therefore, the policy of the United States to eliminate the paradox of poverty in the midst of plenty in this Nation by opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity. It is the purpose of this Act to strengthen, supplement, and coordinate efforts in furtherance of that policy.

Economic Opportunity Act of 1964, Pub. L. No. 88-452, Findings and Declaration of Purpose, § 2, 78 Stat. 508, 508.

25.    Along with the 1964 Economic Opportunity Act that created the Upward Bound program, under President Johnson's leadership, several more laws in the 1960s established new federal programs aimed at combatting poverty. See, e.g., Social Security Amendments of 1965,

Pub. L. No. 89-97, 79 Stat. 286 (creating Medicare and Medicaid); *see also* The Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703.

26.     Among the era's most consequential pieces of legislation was the landmark Higher Education Act of 1965.

**b.      The Higher Education Act of 1965, the Education Amendments of 1968, and the creation of TRIO programs**

27.     Picking up where the Commission left off, Congress in the HEA created a broad array of federal financial loan and grant programs to assist students and their families with the cost of paying for a postsecondary education, as well as grant programs that provided funds directly to postsecondary institutions to fund projects that would help low-income students attend college. *See* Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219.

28.     Since 1965, the HEA and its many component programs have been amended and extended several times, most recently in 2008. *See* Higher Education Opportunity Act of 2008, Pub. L. No. 110-315, 122 Stat. 3078.

29.     The HEA today is organized into eight titles. Most of the student financial aid programs are authorized under Title IV, Student Assistance. *See* § 401(a), 79 Stat. at 1232–34.

30.     Echoing the Commission's views, Congress declared Title IV's "purpose" as "to provide, through institutions of higher education, educational opportunity grants to assist in making available benefits of higher education to qualified high school graduates of exceptional financial need, who for lack of financial means of their own or of their families would be unable to obtain such benefits without such aid." § 401(a), 79 Stat. at 1232.

31.     Specifically, in order "to assist in making available the benefits of postsecondary education," Part A of Title IV authorized "special programs and projects . . . designed . . . to

prepare students from low-income families for postsecondary education." 20 U.S.C. § 1070(a)(4); Higher Education Amendments of 1986, § 401(a), 100 Stat. 1268, 1308.

32.     Part A took two approaches in this respect. One was the establishment of grant programs that provided financial aid *directly* to low-income students to offset the costs of higher education, including the well-known Pell Grant program. *See* Education Amendments of 1972, Pub. L. No. 92-318, § 131, 86 Stat. 235, 247, amended by Education Amendments of 1980, Pub. L. No. 96-374, § 402, 94 Stat. 1367, 1401 (renaming Basic Educational Opportunity Grants to Pell Grants), codified at 20 U.S.C. §§ 1070a – 1070a-2.

33.     Part A's other approach was to establish grant programs that provide funds to institutions to carry out projects offering *support services* to low-income and other students in need.

34.     Among these grant programs are the federal TRIO programs. *See* 20 U.S.C. §§ 1070a-11 to 1070a-18.

35.     In the original HEA, Congress established a second TRIO program known as Talent Search. *See* § 408, Contracts to Encourage Full Utilization of Educational Talent, 79 Stat. 1235–36.

36.     Three years later, Congress created a third TRIO program known today as Student Support Services, which was initially known as Special Services for Disadvantaged Students. *See* Education Amendments of 1968, Pub. L. No. 90-575, § 105(a), 82 Stat. 1014, 1018 (creating Special Services for Disadvantaged Students); Higher Education Amendments of 1986, Pub. L. No. 99-498, § 401(a), 100 Stat. 1268, 1339 (renaming Special Services for Disadvantaged Students to Student Support Services).

37.     Along with Upward Bound and Talent Search, these programs formed a "trio" of federal programs designed to foster increased educational opportunity and attainment.

38.     Since 1968, several other programs have been established, providing a wider range of support services, and they all fall under the "TRIO" umbrella today. *See* 20 U.S.C. §§ 1070a-11 to 1070a-18.

39.     The Department is statutorily *required* to carry out the TRIO programs. Congress directed that:

> The Secretary *shall* . . . carry out a program of making grants and contracts designed to identify qualified individuals from disadvantaged backgrounds, to prepare them for a program of postsecondary education, to provide support services for such students who are pursuing programs of postsecondary education, to motivate and prepare students for doctoral programs, and to train individuals serving or preparing for service in programs and projects so designed.

20 U.S.C. § 1070a-11(a) (emphasis added); *see also* 20 U.S.C. § 1070(b) ("The Secretary *shall*, in accordance with subparts 1 through 9 of this part, carry out programs to achieve the purposes of this part.") (emphasis added); 20 U.S.C. §§ 1070a-11 – 1070a-18.

40.     Today, the national network of TRIO programs is the largest federal infrastructure serving the expansion of college opportunities for the low-income, first-generation college student population.

41.     Approximately 3,400 TRIO projects operate in all 50 states, plus Washington D.C., Puerto Rico, and the Pacific Islands, serving around 900,000 students annually, with the support of more than 1,000 colleges, universities, and community-based organizations. *See, e.g.*, ED, TRIO Footprint in 2023-24;[3] ED, Fiscal Year 2026 Budget Request at 85 ("**FY 2026 Budget Request**").[4]

---

[3] *Available at* https://ope.ed.gov/programs/mapED/storymaps/trio/.

[4] *Available at* https://ed.gov/media/document/fy-2026-congressional-justification-higher-education-110154.pdf.

42.     These programs work. TRIO participants consistently achieve higher rates of high school graduation, college enrollment, retention, and degree attainment compared to peers from similar backgrounds who do not receive TRIO services.[5]

**c.     Congressional funding for the SSS program**

43.     Congress funds SSS, along with the other TRIO programs, via annual appropriations acts.

44.     Annual appropriations acts specify the dollar amount appropriated to the Department for carrying out HEA programs. Congress appropriates funds to the Department at an "account level" to fund individual programs under each title and under the account.

45.     Relevant here, annual appropriations acts provide funding to the Department to carry out the TRIO programs under the "Higher Education" account.

46.     For fiscal year 2024, Congress appropriated $3,283,296,000 to the Department "[f]or carrying out, to the extent not otherwise provided, titles II, III, IV, V, VI, VII, and VIII of the HEA, the Mutual Educational and Cultural Exchange Act of 1961, and section 117 of the Perkins Act . . . ." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 ("**2024 Appropriations Act**").

47.     Congress intended that at least $1.19 billion of the $3.28 billion appropriated be allocated to the Department for carrying out the federal TRIO programs. *See* Explanatory Statement and Spending Tables, 170 Cong. Rec. H2057 (Mar. 22, 2024).[6]

---

[5] *See* COE, *TRIO Fast Fasts*, *available at* https://coenet.org/wp-content/uploads/2025/09/TRIO_Fast-Facts-Research-Brief_v7.pdf.

[6] *Available at* https://www.congress.gov/118/crec/2024/03/22/170/51/CREC-2024-03-22-bk2.pdf.

48.    For fiscal year 2025, Congress passed and President Trump signed a continuing resolution. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) (the "**2025 CR**").

49.    The 2025 CR specifically appropriated to federal agencies for fiscal year 2025 "[s]uch amounts as may be necessary, at the level specified . . . and under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024." § 1101(a), 139 Stat. at 10–11. The applicable appropriation act for purposes of the 2025 CR is the 2024 Appropriations Act. *See* Pub. L. No. 118-47, 138 Stat. 460. The federal fiscal year 2025 ends on September 30, 2025.[7]

**d.    The SSS program**

50.    While its name was changed to "Student Support Services" in 1986, the program has not changed much since its original authorization in 1968, and its core mission remains the same. *See* § 401(a), 100 Stat. at 1339.

51.    The SSS authorizing statute today provides:

> The Secretary shall carry out a program to be known as student support services which shall be designed—
>> (1) to increase college retention and graduation rates for eligible students;
>> (2) to increase the transfer rates of eligible students from 2-year to 4-year institutions;

---

[7] Both Senate and House Committees on Appropriation have recently proposed to continue funding TRIO programs in fiscal year 2026. On July 31, 2025, the Senate Appropriations Committee by a 26-3 vote advanced the Appropriations Subcommittee on Labor, Health and Human Services, Education, and Related Agencies' draft fiscal year 2026 spending bill and allocated $3,267,926,000 to the "Higher Education" budget account. *See* S. 2587, 119th Cong. at 162–64 (2025). The Senate Committee Report directs the Department to allocate $380,816,000 to SSS. *See* S. Rept. 119-55, at 306. House Appropriations Committee Chairman Tom Cole expressly stated that the bill "maintains funding for important education programs, such as TRIO and GEAR UP and Pell Grants." Tom Cole Remarks at FY26 Labor, Health and Human Services, Education, and Related Agencies Bill Subcommittee Markup (Sept. 2, 2025), *available at* https:// appropriations.house.gov/news/remarks/cole-remarks-fy26-labor-health-and-human-services-education-and-related-agencies-bill; *see also* Subcommittee Print, *Making appropriations for the Departments of Labor, Health and Human Services, and Education, and related agencies for the fiscal year ending September 30, 2026, and for other purposes,* 119th Cong. at 142–44 (2025) (allocating $2,714,241,000 to the "Higher Education" budget account).

> (3) to foster an institutional climate supportive of the success of students who are limited English proficient, students from groups that are traditionally underrepresented in postsecondary education, students with disabilities, students who are homeless children and youths (as such term is defined in section 11434a of title 42), students who are in foster care or are aging out of the foster care system, or other disconnected students; and
> (4) to improve the financial literacy and economic literacy of students, including—
>> (A) basic personal income, household money management, and financial planning skills; and
>> (B) basic economic decisionmaking skills.

20 U.S.C. § 1070a-14(a).

52.     The SSS program is implemented by the Department's SSS program regulations found at 34 C.F.R. Part 646.

53.     Eligible recipients of SSS grants are an institution of higher education or a combination of institutions. *See* 34 C.F.R. § 646.2.

54.     Eligible participants in SSS projects are low-income individuals, first-generation college students, or individuals with disabilities who are enrolled or accepted for enrollment at the institution and have a need for academic support to successfully pursue a postsecondary educational program. *See* 34 C.F.R. § 646.3(b)–(d).

55.     SSS grantees are "required" to offer certain services to students, including academic tutoring, counseling, advice in course selection, assistance navigating the federal financial aid process, and helping students at two-year institutions to transfer to four-year institutions. 20 U.S.C. § 1070a-14(b)(1)–(6).

56.     Other services, meanwhile, are "permissible." 20 U.S.C. § 1070a-14(c)(1)–(c)(5) (allowing recipients to provide services for, *inter alia*, mentoring, introducing youth to different career options, and exposure to cultural events and academic programs not usually available to disadvantaged students).

57.     SSS grants are awarded for five years. *See* 20 U.S.C. § 1070a-11(b)(2); *see also* 34 C.F.R. § 646.5 ("Grants or contracts made under this division shall be awarded for a period of 5 years."); ED, Student Support Services Program: Home[8] ("What is the duration of the average grant? All SSS grants are funded for 60 months."). Accordingly, the Department's practice is to hold a competition for SSS grants every five years.

58.     The SSS program has consistently exceeded its stated objectives, including in the most recent three years for which data is available. *See* FY 2026 Budget Request, *supra* ¶ 41 n.4, at 89–91 (reflecting that percentage of SSS participants completing an associate's degree at their original institution or transferring to a 4-year institution within 3 years is above target); *id.* (reflecting that percentage of first-year student SSS participants completing a bachelor's degree at their original institution within 6 years is above target).

## II.     <u>The Department's process for awarding SSS grants</u>

59.     The SSS grant application and award process is outlined in the authorizing statutes, *see* 20 U.S.C. §§ 1070a-11 & 1070a-14, and is implemented by the Department's SSS program regulations, *see* 34 C.F.R. Part 646, in addition to the Department's general administrative grantmaking regulations found at 34 C.F.R. Part 75.[9]

60.     Under the Administrative Procedure Act, federal agencies must follow certain rulemaking processes (notice of proposed rulemaking, opportunity for public comment, review

---

[8]     *Available at* https://www.ed.gov/grants-and-programs/grants-higher-education/federal-trio-programs/student-support-services-program - q3.

[9]     *See* ED, *Discretionary Grantmaking at ED* 14 (2024), https://www.ed.gov/media/document/grantmaking-ed-108713.pdf ("**Discretionary Grantmaking**") ("ED generally uses two types of regulations to award and administer grants: program regulations and administrative regulations. . . . Program regulations apply to all applicants and/or grantees under a particular program. . . . Administrative regulations apply to all grantees.").

and revision, and final rule publication) in order for the rules to carry the force and effect of law. *See* 5 U.S.C. § 553.

61.    Most federal agencies are exempt from the APA's rulemaking procedures when it comes to grantmaking. *See* 5 U.S.C. § 553(a)(2). But not the Department. The General Education Provisions Act ("**GEPA**") largely carves out the Department's grantmaking rules from the APA's exemption in the case of any "applicable program," which includes all TRIO programs. 20 U.S.C. § 1221(b)(1) & (c)(1).

62.    Specifically, under GEPA, the APA's exemption to notice-and-comment procedures for grantmaking applies only to the Department's rules "that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or . . . where the Secretary determines that the requirements of this subsection will cause extreme hardship to the intended beneficiaries of the program affected by such regulations." 20 U.S.C. § 1232(d)(1)–(2).

63.    Otherwise, GEPA affirmatively requires the Department to follow the APA's notice-and-comment process. 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); 5 U.S.C. § 553. In doing so, GEPA ensures that applicants have fair and adequate notice of the rules that the Department uses for grantmaking.

**a.    Notice of invitation to apply for new grant funding**

64.    The ED grantmaking process begins when the Department announces a grant "competition" by publishing a notice of invitation to apply for a particular grant in the Federal Register. *See* 34 C.F.R. § 75.105(b)(1)–(2).

65.    Accompanying a notice of invitation is an application package the Department publishes for prospective grantees containing additional information on how to apply.

66.     A notice of invitation details, among other things, "selection criteria" and "priorities" that the Department commits to use for evaluating, scoring, and deciding which applicants to select for new SSS grants. *See* 34 C.F.R. § 75.217(a) ("The Secretary selects applications for new grants on the basis of applicable statutes and regulations, the selection criteria, and any priorities or other requirements that have been published in the Federal Register and apply to the selection of those applications.").

67.     The "selection criteria" applicable to an SSS grant competition are based on the TRIO and SSS authorizing statutes, SSS program regulations, and the Department's grantmaking regulations, and are set forth in the notice of invitation. *See* 34 C.F.R. §§ 646.20-21; 34 C.F.R. §§ 75.209–10.

68.     Selection criteria include the need for an SSS project, the quality of the applicant's objectives and plan of operation, the institution's commitment to the project, the quality of the applicant's personnel, the extent to which the applicant's budget is reasonable, and the quality of its evaluation plan. *See* 34 C.F.R. § 646.21.

69.     Each selection criterion is assigned a maximum number of points that may be awarded to an applicant. *See* 34 C.F.R. § 646.20(a)(1)(ii).

70.     The "priorities" applicable to an SSS grant competition are established through notice-and-comment rulemaking and published in the Federal Register, and must be set forth in the notice of invitation. *See* 34 C.F.R. § 75.105(b)(1)–(2).

71.     Priorities come in three types: invitational, "competitive preference," and "absolute preference." 34 C.F.R. § 75.105(c)(1)–(3). The effect of each follows:

- Under an "absolute preference" priority, the Department considers only applications that meet the priority. *See* 34 C.F.R. § 75.105(c)(3).

- Under a "competitive preference" priority, the Department gives competitive preference to an application by (1) awarding additional "bonus" points, depending on the extent to which the application meets the priority, or (2) selecting an application that meets the priority over an application of comparable merit that does not meet the priority. *See* 34 C.F.R. § 75.105(c)(2).

- Under an invitational priority, the Department is interested in applications that meet the priority but does not give an application that meets the priority a preference over other applications. *See* 34 C.F.R. § 75.105(c)(1).

72.    GEPA directs the Department to require that grant applicants address equity issues in their applications for new grants. 20 U.S.C. §§ 1221, 1228a. Applicants are statutorily required to:

> develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

20 U.S.C. § 1228a(b). The Department provides instructions to grant applicants that explain how to meet the GEPA Equity Directive.

73.    Applicants for and recipients of SSS grants are also subject to Title VI and the Department's accompanying regulations. *See* 34 C.F.R. § 75.500(a) (referring to "Title VI of the Civil Rights Act of 1964"). Title VI prohibits discrimination on the basis of race, color, or national origin in any program receiving federal financial assistance. *See* 42 U.S.C. § 2000d.

**b.    Peer review and scoring of applications**

74.    All applications for new ED grants must be evaluated unless, first, "[t]he applicant does not comply with all of the procedural rules that govern the submission of the application,"

and second, if "[t]he application does not contain the information required under the program." 34 C.F.R. § 216(a)–(b); 20 U.S.C. § 1070a-11.

75.    After prospective grantees apply, the Department relies on a panel of at least three non-federal, peer reviewers who are experts in the grant program under review—here, SSS. *See* 20 U.S.C. § 1070a-11(g); Discretionary Grantmaking, *supra* ¶ 59, at 25–26.

76.    Peer reviewers evaluate the applications against the selection criteria and priorities in the notice of invitation. For each criterion and priority, a peer reviewer awards points that contribute to an applicant's overall score. The scores by each peer reviewer are averaged. *See* 34 C.F.R. § 646.20–22; 34 C.F.R. § 75.200; 34 C.F.R. § 217.

77.    The Secretary then adjusts the peer reviewers' averaged score based on an applicant's "prior experience" operating a SSS project under an existing grant. *See* 34 C.F.R. § 646.20(a)(2)(i).

78.    The Secretary evaluates prior experience under 34 C.F.R. § 646.22 by taking into account the applicant's performance in meeting project and student objectives during the three project years designated in the notice of invitation. *See* 34 C.F.R. § 646.22(e)(1)–(5).

79.    Applicants can earn up to 15 additional points for prior experience, which is taken as an average of the three designated project years. *See* 34 C.F.R. § 646.20(a)(2)(ii)–(v). If an applicant does not have prior experience for one or two of the three years, the applicant is not eligible for prior experience points for that year.

80.    Unlike many other discretionary programs administered by the Department, the TRIO authorizing statute lays out the order in which the Secretary must award new grants. The statute specifically *requires* the Secretary to fund applicants in the order of the averaged peer reviewer scores as adjusted by the Secretary for prior experience. Per 20 U.S.C. § 1070a-11(c)(3),

the Secretary "*shall* award grants and contracts . . . in the order of the scores received by the application for such grant or contract in the peer review process . . . and adjusted for prior experience." *Id.* (emphasis added); *see also* Discretionary Grantmaking, *supra* ¶ 59, at 27 ("[The Department] uses the scores determined by non-Federal reviewers to make funding determinations.").[10]

81.    This final score determines which applicants receive new SSS grants. The statute thus leaves no room for the Department's discretion in further adjusting the order of scores.

82.    The Department is statutorily required to issue guidance that describes the "steps the Secretary will take to ensure that the final score of an application, including prior experience points for high quality service delivery and points awarded through the peer review process, is determined in an accurate and transparent manner." 20 U.S.C. § 1070a-11(g).

83.    The Department also must inform each applicant with an existing SSS grant about the status of their application for funding under a new SSS grant at least 8 months prior to the expiration of the existing grant. *See* 20 U.S.C. § 1070a-11(c)(7).

**c.    The Department's award process for successful applicants**

84.    If an application is selected, the Secretary issues a formal notification of grant award to the grantee ("GAN"). 34 C.F.R § 75.235(a).

85.    "The grant obligates both the Federal Government and the grantee to the requirements that apply to the grant." 34 C.F.R. § 75.236.

86.    SSS grants "shall be awarded for a period of 5 years." 20 U.S.C. § 1070a-11(b)(2); 34 C.F.R. § 646.5. This five-year period is the "project period."

---

[10] One exception, not relevant here, is that the Secretary does not award a new grant "to an applicant if the applicant's prior project involved the fraudulent use of program funds." 34 C.F.R. § 646.20(d); 20 U.S.C. § 1070a-11.

87.     However, when the Department awards a grant, it commits to funding recipients for an initial 12-month "budget period." 34 C.F.R. § 75.251(b)(1)-(2) ("If the Secretary approves a multi-year project period, the Secretary: (1) Makes a grant to the project for the initial budget period; and (2) Indicates his or her intention to make continuation awards to fund the remainder of the project period.").

88.     Following each budget period, recipients must, *inter alia*, submit performance reports and other information to the Department that demonstrate their substantial progress in achieving the SSS program objectives, that they continue to meet eligibility requirements, and that they maintain financial and administrative management systems that meet certain requirements. *See* 34 C.F.R. § 75.253(a).

89.     Provided these conditions are met, and provided Congress appropriates federal funds to carry out the SSS program, recipients receive a "continuation award" (and a new GAN) that commits to funding the recipient for the next budget period. *See* 34 C.F.R. § 75.253(a); *see also* SSS Webinar Q&A ("Q: What is the difference between a continuation award and a new award? A: New award refers to awards given to institutions who do not have a current grant. A continuation award is for currently funded grantees.").[11]

**d.     The Department's secondary review process for unsuccessful applicants**

90.     Per SSS program regulations, "[a]fter the Secretary issues a notification of grant award to successful applicants, the Secretary notifies each unsuccessful applicant in writing as to the status of its application . . . and provides copies of the peer reviewers' evaluations of the applicant's application and the applicant's PE score, if applicable." 34 C.F.R. § 646.24(c)(3); *see also* 34 C.F.R. § 75.218 (the Department "informs an applicant if its application—(1) Is not

---

[11] *Available at* https://www.ed.gov/sites/ed/files/programs/triostudsupp/sss-webinar-qa.pdf.

evaluated; or (2) Is not selected for funding."); ED, *Getting Started with Discretionary Grant Applications* ("All applicants will receive a copy of the Technical Review Form completed by their peer reviewer panel. The form contains scoring information and identified strengths and weaknesses to improve future applications.").[12]

91.    For those unsuccessful applicants for new SSS grants, the statute and accompanying regulations outline a detailed process through which they may nonetheless be eligible to request "secondary review" of their applications.

92.    When the Department awards new SSS grants, it funds an initial "slate" of successful applicants, but reserves a portion of funds to award grants to applicants that were not selected initially after it performs a "secondary review" of their applications.

93.    Not all applicants are eligible for secondary review. Instead, applicants must have scored high enough to qualify for what is known as the "funding band"—the pool of applicants eligible for secondary review. *See* 34 C.F.R. § 646.24(c) ("For each competition, the Secretary establishes a funding band for the second review of applications."); *id.* ("The Secretary establishes the funding band for each competition based on the amount of funds the Secretary has set aside for the second review of applications.").

94.    "An application that scored below the established funding band for the competition is not eligible for a second review." 34 C.F.R. § 646.24(e).

95.    Per SSS program regulations, "the Secretary notifies each unsuccessful applicant . . . of the funding band for the second review." 34 C.F.R. § 646.24(c)(3).

---

[12] *Available at* https://www.ed.gov/grants-and-programs/apply-grant/getting-started-discretionary-grant-applications.

96.    34 C.F.R. § 646.24(b) applies where the Department *did* evaluate an application and an applicant provides evidence showing that the Department made an administrative or scoring error in the review of the application.

97.    An applicant must have evidence of a scoring error and show that (1) "points were withheld for criteria not required in statute, regulation, or guidance governing the Federal TRIO programs or the application for a grant for such programs" or (2) "information pertaining to selection criteria was wrongly determined to be missing from the application." 20 U.S.C. § 1070a-11(c)(8)(C)(iv)(V)(aa)–(bb).

98.    Specifically, an applicant may request second review by the Department if the applicant (1) "has evidence of a specific technical, administrative, or scoring error made by the Department, an agent of the Department, or a peer reviewer, with respect to the scoring or processing of a submitted application," and (2) has otherwise met all of the requirements for submission of the application. 20 U.S.C. § 1070a-11(8)(C)(i).

99.    Per the Department's regulations, "The Secretary's determination of whether the applicant has met the requirements for a second review and the Secretary's decision on re-scoring of an application are final and not subject to further appeal or challenge." 34 C.F.R. § 646.24(e).

**e.    Title VI nondiscrimination requirement and voluntary compliance precondition**

100.    As noted above, applicants for, and recipients of, SSS grants are subject to Title VI and the Department's accompanying regulations. *See* 42 U.S.C. § 2000d-1; 34 C.F.R. § 75.500(a); 34 C.F.R. §§ 100.4, 104.5, 106.4, 108.8, and 110.23.

101.    Title VI provides an enforcement mechanism for compliance by permitting agencies to refuse to provide new financial assistance or to terminate existing financial assistance, but it requires certain steps to be taken first.

102.    Specifically, Title VI provides that no action refusing to grant federal financial assistance "shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *See* 42 U.S.C. § 2000d-1.

103.    If an agency or department cannot secure voluntary compliance with Title VI, then it may refuse to provide or terminate funding. But refusing to grant funding requires "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement." *Id*.

104.    Further, the head of the department or agency also "shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." *Id.* Any department action refusing to provide or terminating financial assistance does not "become effective until thirty days have elapsed after the filing of such report." *Id.*

105.    Title VI provides for judicial review of agencies' decisions "refusing to grant . . . financial assistance upon a finding of failure to comply with" Title VI's race-discrimination ban in federal district court under the APA. *See* 42 U.S.C. § 2000d-2.

### III.    The 2025 SSS grant competition

#### a.    2019 notice of invitation to apply for new SSS grants

106.    In 2019, during President Trump's first term, the Department invited applications for new SSS awards. *See* Applications for New Awards—Student Support Services Program, 84 Fed. Reg. 68,915 (Dec. 19, 2019).

107.    In 2020, the Department—still under the first Trump Administration—awarded 1,155 new SSS grants, in an average amount of $316,585, that served 208,746 students. In total,

the Department in 2020 allocated $365,656,182.00 to SSS recipients. *See* ED, *Student Support Services (SSS) Program Funding History.*[13]

108.    The Affected Programs were among those that successfully applied for and that received a new award in 2020.

109.    Following each 12-month budget period, the Affected Programs submitted the requisite performance reports and other information to the Department demonstrating their substantial progress towards meeting SSS program objectives.

110.    The Affected Programs all received continuation awards for each budget year thereafter.

111.    The Affected Programs' 2020 SSS grants—and virtually all other programs' SSS grants—expired on August 31, 2025. *See* ED, *SSS Grantees.*[14]

**b.    The Department's 2021 Final Priorities**

112.    In 2021, in accordance with GEPA and the Department's grantmaking regulations, the Department issued proposed supplemental priorities and definitions for discretionary grant programs, and solicited public comment. *See* Proposed Priorities and Definitions, 86 Fed. Reg. 34664 (June 30, 2021). The Department issued its final supplemental priorities and definitions later that year. *See* Final Priorities and Definitions, 86 Fed. Reg. 70612 (Dec. 10, 2021) ("**2021 Final Priorities**").

**c.    The Department's 2022–2023 modification to the GEPA Equity Directive**

113.    As discussed, all applicants for SSS grants are required to submit a GEPA Equity Directive response with their application.

---

[13]    *Available at* https://www.ed.gov/media/document/ope-student-support-services-program-funding-history-109918.pdf.

[14]    *Available at* https://www.ed.gov/media/document/fy-2024-sss-awards-109464.pdf.

114.    In 2022, in response to President Biden's January 25, 2021 Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, the Department proposed changing this form to its current four-question format. *See* Agency Information Collection Activities; Comment Request; GEPA Section 427 Guidance for All Grant Applications, 87 Fed. Reg. 47,733 (Aug. 4, 2022) ("In response to the Agency's Equity Plan resulting from the President's Executive Order 13985, we now propose we now propose [sic] to update that form by expanding the number of questions from one to four."); Agency Information Collection Activities; Submission to the Office of Management and Budget for Review and Approval; Comment Request; GEPA Section 427 Guidance for All Grant Applications, 87 Fed. Reg. 65,198, (Oct. 28, 2022).

115.    The current GEPA Equity Directive form asks (1) "Describe how your entity's existing mission, policies, or commitments ensure equitable access to, and equitable participation in, the proposed project or activity"; (2) "Based on your proposed project or activity, what barriers may impede equitable access and participation of students, educators, or other beneficiaries?" (3) "Based on the barriers identified, what steps will you take to address such barriers to equitable access and participation in the proposed project or activity?" and (4) "What is your timeline, including targeted milestones, for addressing these identified barriers?" *See* ED, GEPA Section 427 Form.[15]

d.      **2024 notice inviting applications for new SSS grants incorporates 2021 competitive preference priorities**

116.    In advance of the August 31, 2025 expiration date of the 2020 SSS grants, the Department in 2024 announced a SSS grant competition for 2025. *See* SSS Webinar Q&A, *supra*

---

[15] *Available at* https://sites.ed.gov/idea/files/Grants-Part-C-GEPA-Section-427-Form.pdf.

¶ 89 ("New awards will be made in the summer of 2025, with a program start date of Sept 1 2025.").

117.    Consistent with historical practice, the Department issued the notice of invitation early enough to provide time for peer review evaluation and scoring of applications and to leave time for unsuccessful applicants to seek secondary review. *See* SSS Webinar Q&A *supra* ¶ 89 ("Q: Why is this competition being held so early if awards won't be made until 2025? A: For planning purposes and to inform current project staff in a timely manner, if unsuccessful.").

118.    Specifically, on May 1, 2024, the Department published in the Federal Register a notice of invitation for new SSS grant applications for fiscal year 2025. *See* Notice Inviting Applications—Student Support Services Program, 89 Fed. Reg. 35,080 (May 1, 2024) ("**2024 NIA**").

119.    Along with the 2024 NIA, the Department issued an application package for the 2025 SSS competition. *See* ED, FY 2025 Application for Grants Under the Student Support Services Program ("**Application Package**").[16]

120.    The 2024 NIA estimated spending $381,883,715 on the SSS program for fiscal year 2025 but as is customary, stated that "[t]he actual level of funding, if any, depends on final congressional action. However, we are inviting applications to allow enough time to complete the grant process if Congress appropriates funds for the Federal TRIO Programs." 2024 NIA, 89 Fed. Reg. at 35,082.

121.    Congress would indeed later appropriate at least $1.19 billion in fiscal year 2025 appropriations for the federal TRIO programs. *See* Explanatory Statement and Spending Tables, *supr*a ¶ 47.

---

[16] *Available at* https://apply07.grants.gov/apply/opportunities/instructions/PKG00286185-instructions.pdf

122.    Consistent with the process detailed above, the 2024 NIA defined the selection criteria and priorities applicable to the 2025 SSS competition.

123.    Per the 2024 NIA, "[t]he selection criteria for this competition are from 34 CFR 646.21 and 75.210." 89 Fed. Reg. at 35,803 (listing selection criteria).

124.    Per the 2024 NIA, "[t]his notice contains two competitive preference priorities. Competitive Preference Priorities 1 and 2 are from the Secretary's [2021 Final Priorities], published in the Federal Register on December 10, 2021." 89 Fed. Reg. at 35,080; 2021 Final Priorities, 86 Fed. Reg. at 70,612.

125.    The 2024 NIA informed applicants that it would use these competitive priorities "when we make awards . . . for FY 2025." 89 Fed. Reg. at 35,080.

126.    The first competitive preference priority is titled, "Meeting Student Social, Emotional, and Academic Needs," and allowed an applicant to earn up to three points. The notice elaborates on the first competitive preference priority, stating further:

> Projects that are designed to improve students' social, emotional, academic, and career development needs, with a focus on underserved students, by creating education and work-based settings that are supportive, positive, identity-safe and inclusive, including with regard to race, ethnicity, culture, language, and disability status, through the following activity:
>
> Supporting students to engage in high-quality, real-world, hands-on learning that is aligned with classroom instruction and takes place in community-based settings, such as apprenticeships, pre-apprenticeships, work-based learning, and service learning, and in civic activities, that allow students to apply their knowledge and skills, strengthen their employability skills, such as critical thinking, complex problem solving, and effective communication, and access career exploration opportunities.

2024 NIA, 89 Fed. Reg. at 35,080–81.

127.    The second competitive preference priority is titled, "Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success," and allowed an

applicant to earn up to five points. The 2024 NIA elaborates on the second competitive preference priority, stating:

> Projects that are designed to increase postsecondary access, affordability, completion, and success for underserved students by addressing one or both of the following priority areas:
>
> (a) Increasing postsecondary education access and reducing the cost of college by creating clearer pathways for students between institutions and making transfer of course credits more seamless and transparent (up to 2 points).
>
> (b) Establishing a system of high-quality data collection and analysis, such as data on enrollment, persistence, retention, completion, and post-college outcomes, for transparency, accountability, and institutional improvement (up to 3 points).

2024 NIA, 89 Fed. Reg. at 35,081. The 2024 NIA defined an "underserved student" to include "[a] student of color." *Id.*

128.    The 2024 NIA stated that "We will award up to 105 points to an application under the selection criteria and up to 8 additional points to an application under the competitive preference priorities, for a total score of up to 113 points." 2024 NIA, 89 Fed. Reg. at 35,083.

129.    The Department's Application Package stated: "We hope applicants will consider addressing these competitive preference priorities." *See* Application Package, *supra* ¶ 119, at 3.

130.    The 2024 NIA also stated that "the Secretary will award up to 15 prior experience points to applicants that have conducted an SSS Program project within the last three Federal government fiscal years, based on their documented experience." 2024 NIA, 89 Fed. Reg. at 35,084.

131.    The Application Package also directed applicants to submit the GEPA Equity Directive. *See* Application Package, *supra* ¶ 119, at 63, 77; 20 U.S.C. § 1228a(b).

132.    The Department stated that GEPA "allows applicants discretion in developing the required description. The statute highlights six types of barriers that can impede equitable access or participation: gender, race, national origin, color, disability, or age." ED, GEPA Notice to All Applicants.[17]

133.    The Department further stated that "[w]e recognize that many applicants may already be implementing effective steps to ensure equity of access and participation in their grant programs, and we appreciate your cooperation in responding to the requirements of this provision." *See* GEPA Notice to All Applicants, *supra* ¶ 132.

**e.    Applications are submitted, peer reviewed and evaluated, and scored**

134.    The Department received 1,702 eligible applications for new SSS grants, with applicants requesting a total of $532,973,132.

135.    The Affected Programs submitted timely Applications to the Department.

136.    All of their Applications addressed the selection criteria, all of their applications contained the mandatory GEPA Equity Directive, and many of their Applications addressed the two competitive preference priorities.

137.    The Affected Programs' Applications, as required, also contained an assurance of their compliance with federal civil rights laws, including Title VI. *See* 34 C.F.R. § 75.500.

138.    Upon information and belief, the peer review evaluation and scoring process commenced in late 2024 and ended in early 2025.

---

[17] *Available at* https://www.ed.gov/media/document/general-education-provisions-act-gepa-requirements-section-427-ed-gepa-427-formpdf-11063.pdf.

139.    As of January 2025, "8 months prior to the expiration of" the Affected Programs' 2020 SSS grants, the Department had not notified the Affected Programs of the status of their Applications, as was required by statute. 20 U.S.C. § 1070a-11(c)(7).

### f.    The Trump Administration's new policies and priorities

140.    The Trump Administration assumed office on January 20, 2025 and immediately issued several executive orders and directives critical of diversity, equity, and inclusion practices.

141.    The executive orders directed the Department and other agencies to eliminate DEI policies and initiatives from all aspects of the federal government. *See, e.g.*, Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025) ("**EO 14173**"); Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ("**EO 14151**") (EO 14173 and EO 14151 collectively, the "**DEI Executive Orders**").

142.    EO 14173 states that "critical and influential institutions of American society," including the federal government and institutions of higher education, "have adopted and actively use dangerous, demeaning, and immoral race-and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." 90 Fed. Reg. at 8,633.

143.    EO 14173 expressly "directs" the U.S. Office of Management and Budget ("**OMB**") to "[e]xcise references to DEI and DEIA principles under whatever name they may appear," including federal grants. 90 Fed. Reg. at 8,634.

144.    EO 14151 instructs "each agency, department, or commission head," to provide OMB a list of all "[f]ederal grantees who received [f]ederal funding to provide or advance DEI . . . programs, services, or activities since January 20, 2021." 90 Fed. Reg. at 8,339. EO 14151 further

directs agency heads to assess the operational impact and cost of those specified grants and recommend action. 90 Fed. Reg. at 8,340. It expressly directs agency heads to "terminate . . . all . . . 'equity-related' grants." *Id.* at 8,339.

145.    Since January 2025, thousands of applicants for and recipients of federal grants and contracts have been denied federal funding or had existing grants terminated on account of language appearing on their websites, advertisements, logos, grant documents, and other materials and literature containing any word or phrase that might fall within scope of DEI.

146.    The Trump Administration also announced plans to close the Department itself. *See* Exec. Order 14242, *Improving Education Outcomes by Empowering Parents, States, and Communities*, 90 Fed. Reg. 13,679 (Mar. 20, 2025) ("**EO 14242**"). EO 12424 directed the Secretary to "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely." *Id.*

147.    In connection with its plans to shutter the Department itself and reduce federal spending towards higher education, the Executive Branch targeted the TRIO programs for elimination. The Department's fiscal year 2026 budget request states:

> The Administration does not request funding for the Federal TRIO programs for fiscal year 2026, $1,191 million less than the fiscal year 2024 appropriation. Elimination of this program is part of the Administration's overall effort to restore fiscal discipline and reduce the Federal role in education. TRIO has failed to meet the vast majority of its performance measures, and studies of program effectiveness have shown that it has not increased college enrollment. States, localities, and institutions of higher education, not the Federal government, are best suited to determine whether to support the activities authorized under this program or similar activities within their own budgets and without unnecessary administrative burden imposed by the Federal government.

*See* FY 2026 Budget Request, *supra* ¶ 41, at 86.

148.    Similarly, OMB on May 2, 2025 proposed eliminating funding for all the TRIO programs. OMB stated:

> TRIO and GEAR UP are a relic of the past when financial incentives were needed to motivate Institutions of Higher Education (IHEs) to engage with low-income students and increase access. The lack of action by IHEs also meant that States and local school districts needed additional support to prepare low-income students for college. Today, the pendulum has swung and access to college is not the obstacle it was for students of limited means. IHEs should be using their own resources to engage with K-12 schools in their communities to recruit students, and then once those students are on campus, aid in their success through to graduation. A renewed focus on academics and scholastic accomplishment by IHEs, rather than engaging in woke ideology with Federal taxpayer subsidies, would be a welcome change for students and the future of the Nation.

Letter from Russell Vought, Director of OMB, to the Honorable Susan Collins, Chair, Senate Committee on Appropriations, at 5 (May 2, 2025).[18]

**g.    May 2025 publication of a new Proposed Rule to rescind the 2021 Final Priorities**

149.    On May 21, 2025, the Department published a new proposed rule in the Federal Register intended to replace the 2021 Final Priorities and all other agency-wide supplemental priorities published prior to January 20, 2025. *See* Proposed Priorities and Definitions, 90 Fed. Reg. 21,710 (May 21, 2025) ("**2025 Proposed Priorities**").

150.    Critically, the 2025 Proposed Priorities state: "However, those [2021 Final Priorities] *remain in effect* for notices inviting applications (NIAs) published before the U.S. Department of Education (Department) finalizes the proposed priorities in this document." 90 Fed. Reg. at 21,710 (emphasis added).

---

[18] *Available at* https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

151.    The Department finalized its new priorities on September 9, 2025 and published them in the Federal Register; they become effective October 9, 2025. *See* Final Priorities and Definitions, 90 Fed. Reg. 43,514 (Sept. 9, 2025) ("**2025 Final Priorities**").

152.    In addressing its desire to replace the 2021 Final Priorities, the Department stated:

> These priorities do not change the enforcement of Federal civil rights laws. Rather, it is necessary to repeal the 2021 priorities because they encourage recipients to violate Federal civil rights law—particularly Title VI of the Civil Rights Act of 1964—by using race-based preferences and stereotypes, and racial exclusion in their programs and to use Federal funds to promote or endorse gender ideology and political activism.

*See* 90 Fed. Reg. at 43,514.

**h.    The Department's denial of the Affected Programs' Applications**

153.    In or around July 2025, the Department notified applicants for new SSS grants whether their applications were evaluated and selected for funding.

154.    In or around July 2025, the Department notified 962 applicants that they had received a total score of 113.3 points or higher and had been selected for funding during the first "slate."

155.    The Department obligated $313,547,951 in fiscal year 2025 funds to this first slate of grantees.

156.    The Department notified an unknown number of other applicants that scored below 113.3 points, but above 112 points, that they were in the "funding band" and were eligible to request a secondary review.

157.    In July 2025, the Department notified the Affected Programs by letter that their Applications had been "examined" but had "not been selected based on the Department's review for potential conflicts with applicable nondiscrimination requirements."

158.    The Department's denial letter to every Affected Program is virtually identical. The Department stated that unidentified "staff" at the Department examined their Applications and determined that they were "inconsistent with applicable nondiscrimination statutes, regulations, policies, and other requirements applicable to the program."

159.    Specifically, the letters stated that a staff member had:

> identified information indicating that the proposed activities take account of race in ways that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law. [citation omitted]. The application is therefore inconsistent with applicable nondiscrimination statutes, regulations, policies, and other requirements applicable to the program. 34 C.F.R. § 75.500; see also 2 C.F.R. § 200.211(c). Therefore, the Department has not recommended your application for selection.

160.    The only difference between the letters to each Affected Program is the page number cited in their respective Applications.

161.    Some of the page numbers cited in the letters, however, do not match any page in the Applications. Other page numbers correspond to pages that do not contain language that have any reference, direct or indirect, to race, color, diversity, or other terms that has led executive agencies to terminate and deny applicants other grants in recent months.

162.    Each denial letter cited 34 C.F.R. § 75.500. This regulation provides that "[e]ach grantee must comply with the following statutes and regulations," and refers to "Title VI of the Civil Rights Act of 1964." *Id.* § 75.500(a); *id.* at Table 1 to paragraph (a).

163.    Prior to issuing the denial letters in July 2025, the Department had not informed Affected Programs about any alleged Title VI compliance concerns.

164.    Prior to issuing the denial letters in July 2025, the Department did not afford the Affected Programs any hearing as to any Title VI compliance concerns.

165.    Prior to issuing the denial letters in July 2025, the Department did not seek Affected Programs' "voluntary compliance" with Title VI.

166.    The Department's denial letters did not state or otherwise indicate that the Department had determined that the Affected Programs' voluntary compliance was not possible.

167.    The Department's denial letters did not provide the Affected Programs "a copy of the Technical Review Form completed by their peer reviewer panel."[19]

168.    The Department's denial letters all stated in identical fashion that the Affected Programs were not eligible to seek secondary review under 34 C.F.R. § 646.24:

> Please note that the Department's determination of potential compliance with the nondiscrimination provisions of 34 C.F.R. § 75.500 is not subject to the secondary review procedures outlined in 34 C.F.R. § 646.24 for mathematical errors or errors in the peer review process.

169.    Despite its statement regarding secondary review, the letters invited Affected Programs to contact the Department if they felt that "this determination was made in error."

170.    Virtually all Affected Programs contacted the Department, explaining in letters why they believe the Department had erred.

171.    The Affected Programs also requested that the Department provide them a copy of their peer review forms, whereby the peer reviewer panel evaluated and scored their Applications.

172.    To date, however, the Department has not meaningfully responded to any of the Affected Programs' letters or provided any of the Affected Programs with a copy of their peer review forms. In response to Big Bend Community College ("**Big Bend CC**")'s request for its scores, the Department stated, "we are not providing reviewer comments for applicants whose applications did not comply with Federal civil rights law." The Department ignored a follow up

---

[19] Getting Started with Discretionary Grant Applications, *supra* ¶ 90.

request regarding further clarification because Big Bend CC's denial letter cited a page that did not exist. (In denying Big Bend CC's application, it cited "Page e100," but Big Bend CC's application only had 65 pages.)

173.    Other unsuccessful applicants, which are not among the Affected Programs, were denied because they did not score high enough (above 112 points) on their applications to be eligible for the funding band. These applicants, however, were informed of their scores, and received copies of their peer reviewed applications.

174.    Critically, these other unsuccessful applicants' peer review applications reflect that they were awarded points for addressing the competitive preference priorities that counted towards their final scores.

175.    In other words, whereas some applicants were awarded points for successfully addressing the Department's competitive preference priorities, the Department denied Affected Programs' Applications for addressing these same priorities.

176.    Upon information and belief, the Affected Programs scored high enough (113.3 points or above) to have received a new SSS grant, or alternatively, scored above 112 points and thus were in the funding band and were eligible to request secondary review. Indeed, the Department told other applicants if they did not score above 112 points and thus were not eligible to request a secondary review.

177.    Affected Programs are unable to provide services under their SSS projects which they had been operating for years, if not decades. Affected Programs instead have been laying off staff and employees, and students who would have participated in their SSS projects are not receiving support services.

178.    On September 25, 2025, the Department notified an unknown number of applicants in the funding band that were eligible for and requested secondary review that they received a new SSS grant.

## VIOLATIONS OF LAW

179.    The Department's denials of the Affected Programs' Applications violates the APA, the HEA, Title VI and the Constitution in numerous respects.

**1.    The Department failed to follow the evaluation criteria stated in the NIA by ignoring the fact that it requested a response to the competitive preference priorities and required a GEPA Equity Directive as part of the Application Package.**

180.    The Department's priorities applicable to the 2025 SSS competition were set forth in the 2024 NIA. The 2024 NIA expressly invited the Affected Programs and other applicants to address two competitive preference priorities that relate to "underserved students," including students "of color." 2024 NIA, 89 Fed. Reg. at 35,081. The Application Package stated: "We hope applicants will consider addressing these competitive preference priorities." *See* Application Package, *supra* ¶ 119, at 3.

181.    The 2024 NIA informed applicants that they would be awarded bonus points depending on how well they addressed these priorities. 2024 NIA, 89 Fed. Reg. at 35,081.

182.    The Department directed applicants to submit a GEPA Equity Directive and encouraged them to exercise "discretion" when addressing "types of barriers that can impede equitable access or participation" in education, including barriers based on "gender, race, national origin, color, disability, or age." Application Package, *supra* ¶ 119, at 3; GEPA Notice to All Applicants, *supra* ¶ 132; 20 U.S.C. § 1228a(b).

183.    The Department's July 2025 denial letters stated that the Affected Programs' Applications were denied because their "proposed activities take account of race in ways that

conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law."

184.    In denying the Applications because they included information and language that the Department had asked for as part of the competitive preference priorities and/or required as part of the GEPA Equity Directive, the Department acted contrary to law, in excess of statutory authority, and its decision is arbitrary and capricious.

**2.    The Department retroactively applied the 2025 Proposed Priorities' rescindment of the 2021 Final Priorities and DEI Priorities, despite neither having undergone the required notice and comment rulemaking, to deny the Applications.**

185.    The Administration announced new priorities in the May 2025 Proposed Priorities and announced that it proposed to "replace" the 2021 Final Priorities, including the two competitive preference priorities in the 2024 NIA.

186.    The Department acknowledged that the 2025 Proposed Priorities—and the proposed replacement of the 2021 Final Priorities—did not apply to the 2024 NIA and the Applications.

187.    The 2025 Proposed Priorities explicitly state:

> However, those [2021 Final Priorities] priorities remain in effect for notices inviting applications (NIAs) published before the U.S. Department of Education (Department) finalizes the proposed priorities in this document.

2025 Proposed Priorities, 90 Fed. Reg. at 21,710.

188.    The Department recently confirmed the point elsewhere. In *U.S. Department of Education v. American Association of Colleges for Teacher Education*, the Department stated in its reply brief before the Fourth Circuit with respect to the applicability of the 2021 Final Priorities, "plaintiffs are correct that this list of priorities can only be changed by notice-and-comment rulemaking . . . ." No. 25-1281, Doc. 39, 2025 WL 2376288, at *19 (4th Cir. Aug. 6, 2025).

189.    The Department, however, later treated the 2025 Proposed Priorities' proposed rescission of the 2021 Final Priorities as final, despite not having undergone notice-and-comment rulemaking and not finalizing the 2025 Proposed Priorities at the time of the July 2025 denial letters.

190.    GEPA expressly carves out from the APA's exemption for notice-and-comment rulemaking in the grantmaking context when the Department establishes new priorities to follow for awarding discretionary grants to the SSS program. *See* 20 U.S.C. § 1232.

191.    The two narrow exceptions to the rulemaking requirement in GEPA were not invoked by the Department in the 2025 Proposed Priorities and do not apply in any event. 20 U.S.C. § 1232(d)(1)–(2).

192.    Even if the 2025 Proposed Priorities applied to retroactively "replace" the 2021 Final Priorities (they do not), the 2025 Proposed Priorities were not finalized and published in the Federal Register at the time the Department issued the denial letters in July 2025.

193.    The 2025 Final Priorities, which are not effective until October 9, 2025, address the Department's policy regarding Title VI compliance and state:

> These priorities do not change the enforcement of Federal civil rights laws. Rather, it is necessary to repeal the 2021 priorities because they encourage recipients to violate Federal civil rights law—particularly Title VI of the Civil Rights Act of 1964—by using race-based preferences and stereotypes, and racial exclusion in their programs and to use Federal funds to promote or endorse gender ideology and political activism.

2025 Final Priorities, 90 Fed. Reg. at 43,514.

194.    Insofar as the Department believes the 2021 Final Priorities "encourage recipients to violate Federal civil rights law," it was arbitrary and capricious for the Department to penalize the Affected Programs for responding to the 2021 Final Priorities in the 2024 NIA.

195.    The Department retroactively applied its proposed rescission of the 2021 Final Priorities, despite the 2021 Final Priorities being in effect when the Affected Programs submitted the Applications, and despite the 2021 Final Priorities still remaining in effect when the Department denied the Applications in July 2025.

196.    "[A]n agency may not promulgate 'retroactive' rules without express authorization from Congress." *See Cox v. Kijakazi*, 7 F.4th 983, 991 (D.C. Cir. 2023). "An administrative rule is retroactive if it 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.'" *Id.* (quoting *Nat'l Mining Ass'n v. Dep't of the Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999); *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-814 (BJR), 2025 WL 2322763, at *18 (W.D. Wash. Aug. 12, 2025) (ordering that HUD "may not retroactively apply such conditions to grant agreements during the effective period of this preliminary injunction"). Here, no such authorization from Congress exists.

197.    The Department's decision to apply new policies retroactively in the course of evaluating the Applications—submitted in 2024 pursuant to the terms of the 2024 NIA—is contrary to law and in excess of statutory authority, is without observance of procedure required by law, and is arbitrary and capricious.

198.    In addition, the Department's reliance on policies set forth in the DEI Executive Orders to deny the Applications was arbitrary and capricious. "[T]he fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review." *City of Fresno v. Turner*, No. 3:25-cv-7070 (RS), 2025 WL 2721390, at *8 (N.D. Cal. Sept. 23, 2025) (quoting *Kingdom v. Trump*, No. 1:25-cv-691 (RCL), 2025 WL 1568238, at *10 (D.D.C. June 3, 2025)). "If it did, presidential administrations [could] issue

agency regulations that evade APA-mandated accountability by simply issuing an executive order first. Agencies would be permitted to implement regulations without the public involvement, transparency, and deliberation required under the APA." *Id.* (alteration in original).

199.    The 2024 NIA did not include the policies in the DEI Executive Orders (nor could it have), and the policies and priorities in the DEI Executive Orders had not undergone notice-and-comment rulemaking or become final at the time of the denial letters in July 2025. The Department's decision to apply the policies in the DEI Executive Orders retroactively in the course of evaluating the Applications—submitted in 2024 pursuant to the terms of the 2024 NIA—is contrary to law, in excess of statutory authority, without observance of procedure required by law, and arbitrary and capricious.

### 3.    The Department failed to follow the procedures that Title VI requires before denying an application for federal funding.

200.    Title VI outlines a series of specific procedures that must be followed before the Department may deny funding to a grant applicant based on Title VI compliance. *See* 42 U.S.C. § 2000d-1.

201.    In the denial letters, the Department relied on Title VI to deny the Applications, stating that they "take account of race in ways that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education" and were "inconsistent with applicable nondiscrimination statutes, regulations, policies, and other requirements applicable to the program. 34 C.F.R. § 75.500; *see also* 2 C.F.R. § 200.211(c)." (citations in letter).

202.    34 C.F.R. § 75.500 itself refers to the Department's regulations under 34 C.F.R. Part 100 that "effectuate the provisions of title VI of the Civil Rights Act of 1964." 34 C.F.R. § 100.1.

203.    34 C.F.R. Part 100 "applies to any program to which Federal financial assistance is authorized to be extended to a recipient under a law administered by the Department, including the Federal financial assistance listed in appendix A of this regulation."

204.    Appendix A expressly refers to programs under Title IV of the HEA, including SSS. *See* Appx. A to 34 C.F.R. Part 100, Part 1(21); *see also* 2024 NIA, 89 Fed. Reg. at 35,084 ("In addition, in making a competitive grant award, the Secretary requires various assurances, including those applicable to Federal civil rights laws that prohibit discrimination in programs or activities receiving Federal financial assistance from the Department (34 CFR 100.4, 104.5, 106.4, 108.8, and 110.23).").

205.    34 C.F.R. § 100.6 provides that "the responsible Department official shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with this part and shall provide assistance and guidance to recipients to help them comply voluntarily with this part."

206.    34 C.F.R. § 100.8 provides that "[i]f there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law."

207.    34 C.F.R. § 100.8(c) provides that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means," (2) "there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to

comply with a requirement imposed by or pursuant to this part," and (3) "the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action."

208.    Prior to sending the denial letters in July 2025, the Department had not informed the Affected Programs, formally or informally, about any failure or threatened failure to comply with Title VI.

209.    The Department likewise did not follow any of the other procedures under 34 C.F.R. Part 100 before sending the denial letters in July 2025. The Department never provided the Affected Programs an opportunity for a hearing, never provided the Affected Programs with the opportunity to voluntarily comply with Title VI, and never made an express finding on the record that the Affected Programs failed to comply with Title VI.

210.    Not only did the Department never request voluntary compliance, it ignored some Affected Programs' requests for more information that may have culminated in voluntary compliance. After the Department rejected Big Bend CC's request to see its scores, Big Bend CC stated:

> If we are unable to receive our scores, I would like to respectfully request further clarification regarding the Department's determination that our applications did not comply with Federal civil rights law. . . .
>
> We are committed to ensuring that our proposals align with all federal requirements and would greatly appreciate any additional information or guidance you can provide to help us better understand the Department's determination.

211.    Additionally, upon information and belief, the Department, through the Secretary, never filed a full written report of the circumstances and the grounds for denying the Applications

with the Senate Committee on Health, Education, Labor, and Pensions or the House Committee on Education and the Workforce.

212.    Upon information and belief, the Department has afforded compliance opportunities to applicants for grants under other programs administered by the Department that are more aligned with the Trump Administration's new policies and priorities.

213.    Consequently, the Department acted contrary to law, in excess of statutory authority, and without observance of procedure.

**4.    The Department failed to follow the HEA and its own regulations in numerous other respects.**

214.    The Department failed to adhere to strict requirements in the HEA and its regulations governing the application and award process.

215.    The Department failed to notify the Affected Programs of the status of their Applications "at least 8 months prior to the expiration of" their prior 2020 SSS grants. 20 U.S.C. § 1070a-11(c)(7).

216.    Further, the HEA and the Department's regulations require that the Department award SSS grants in the order of the peer review averaged score as adjusted by the Secretary for prior experience.

217.    The Department failed to follow the statutory and regulatory scheme because it did not award new SSS grants in the required order.

218.    Accordingly, the Department's decision to ignore the order for awarding new grants is contrary to law, in excess of statutory authority, is arbitrary and capricious, and it acted without observing proper procedure.

219.    Further, the Department failed to follow the statutory and regulatory requirements that apply to the secondary review process. The Department is required to permit an applicant to

seek secondary review of an eligible application that was denied. *See* 20 U.S.C. § 1070a-11(8)(C)(i); 34 C.F.R. § 646.24(a)–(c). Upon information and belief, to the extent the Affected Programs did not score 113.3 points or higher, the Affected Programs were eligible to seek secondary review because they received scores above 112 points.

220.    The Department failed to follow its regulations applicable to secondary review by stating in its denial letters to the Affected Programs that its "determination of potential compliance with the nondiscrimination provisions of 34 C.F.R. § 75.500 is not subject to the secondary review procedures outlined in 34 C.F.R. § 646.24 for mathematical errors or errors in the peer review process." This determination has no basis in law.

221.    Accordingly, the Department's decision to deny secondary review is contrary to law, in excess of statutory authority, is arbitrary and capricious, and it acted without observing proper procedure.

222.    The Department failed to follow its regulations because it "must" assess applications for new grants based on their "merit." 2 C.F.R. § 200.205; 2 C.F.R. § 3474.1 (Department adoption of 2 C.F.R. Part 200, with minor, unrelated exceptions). "A merit review is an objective process of evaluating Federal award applications in accordance with the written standards of the Federal agency." 2 C.F.R. § 200.205

223.    The Department did not engage in "merit" review of the Applications in violation of these regulations, and thus its denial decisions are contrary to law, in excess of statutory authority, are arbitrary and capricious, and failed to observe proper procedure.

## HARM TO COE AND AFFECTED PROGRAMS

224.    Without injunctive relief directing the Department to vacate the denial letters, to reconsider the Applications under the appropriate 2021 Final Priorities and the 2024 NIA, and to

comply with the proper statutory and regulatory processes for awarding grants, COE and the Affected Programs will be irreparably harmed.

    **a.**    **Harm to COE**

225.    Absent Court intervention, COE will suffer various harms. COE is the leading nonprofit membership organization in the United States for colleges and universities that participate in the SSS program.

226.    COE has a keen interest in the Department following the statutory and regulatory scheme that governs the SSS program.

227.    COE has dedicated enormous time, money, and resources to ensure that the Department adheres to the governing law and regulations applicable to TRIO.

228.    The Department's blatant disregard for the carefully constructed laws and regulations applicable to SSS, including but not limited to the evaluation and scoring of applications, the awarding of grants, and the opportunities for denied applicants to seek secondary review, is deeply troubling to COE.

229.    The Department's actions against the Affected Programs are directly adverse to COE's core mission of ensuring all students have an equal opportunity to access postsecondary education.

230.    The Department's denial of the Affected Programs' Applications is contrary to the agency's duty to perform a "merit" review of applications for discretionary grants and to "select recipients most likely to be successful in delivering results based on the program objectives through an objective process of evaluating Federal award applications." 2 C.F.R. § 200.205.

231.    "The detriment to Plaintiffs' organizational missions and to student education cannot be remedied through retroactive relief." *New York v. McMahon*, 784 F. Supp. 3d. 311, 362

(D. Mass. 2025); *John T. v. De. Cnty. Intermediate Unit*, No. 98-cv-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time.").

232.     Absent Court intervention, Affected Programs will be forced to shut down their programs as a result of the Department's unlawful actions, resulting in great harm to COE's core mission and purpose. *See Mediplex of Mass., Inc. v. Shalala*, 39 F. Supp. 2d 88, 99 (D. Mass. 1999) (finding that owner of a nursing facility had "an interest in protecting the health of its residents and [could] assert harm to them as irreparable harm for the purpose of [the] motion [for preliminary injunction]"); *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (noting the "lasting impact of [education's] deprivation on the life of the child," that "education has a fundamental role in maintaining the fabric of our society," and "the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.").

**b.      Harm to the Affected Programs**

233.     Absent Court intervention, the harm to the Affected Programs is simple. By applying the wrong criteria—the 2025 Proposed Priorities' rescindment of the 2021 Final Priorities and the DEI Priorities (neither of which had undergone notice-and-comment rulemaking) that is the complete reverse of what the 2024 NIA indicated (the 2021 Final Priorities), and the Department improperly denied the Affected Programs the ability to offer SSS project services to students.

234.     For example, South Illinois University-Carbondale ("**SIU-Carbondale**") was awarded a five-year SSS grant in July 2020 that expired on June 30, 2025. SIU-Carbondale timely applied for a new SSS grant to continue operating its SSS program. Green River College ("**Green**

**River**") and Big Bend CC operated programs during the same period, and also applied for new SSS grants under the 2024 NIA.

235.    The Department has denied the Affected Programs a basic opportunity to even compete for a new SSS grant by evaluating their Applications against new policies it could not have known when they applied. *See Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *5 (D.C. Cir. Aug. 28, 2025) (being deprived of the opportunity to "compete for [ ] funds even if not guaranteed to obtain them" is a form of injury); *Am. Assoc. of Physc. Teachers, Inc. v. Nat'l Sci. Found.*, No. 1:25-cv-1923 (JMC), 2025 WL 2615054, at *14 (D.D.C. Sept. 10, 2025) (same).

236.    The harm to the Affected Programs is immediate. The 2025-2026 academic year and the 2025-2026 budget period for SSS programs has already begun and without immediate relief requiring the Department to reconsider their Applications in a lawful manner and to follow its procedures for awarding new grants in accordance with the final scores already awarded, the Affected Programs will be unable to administer their SSS projects.

237.    The Affected Programs have relied heavily, if not exclusively, on federal funding to operate their SSS projects, and without the possibility of being awarded such funding following a lawful review process, the Affected Programs will be unable to continue operating their SSS projects as they have done for years.

238.    For example, Green River relied exclusively on federal funding to operate its SSS project and without that funding, Green River will no longer be able to serve current SSS students. Big Bend CC, too, relied exclusively on federal funding to operate its SSS program. Without funding, it has been forced to discontinue its SSS project. Big Bend CC's 120 students will no longer receive the benefits the SSS program was intended to offer. SIU-Carbondale is also no

longer operating its SSS project. SIU-Carbondale relied largely on federal funding, and without 2025-2026 funding, it will be unable to continue its SSS program and will have to lay off staff. SIU-Carbondale's commitment to students will be broken: the school accepted students with the understanding that it would offer four years of support. Because the Department denied its application to continue its SSS program, SIU-Carbondale has no choice but to close its SSS project.

239.    The harm to the Affected Programs will continue long into the future as well. The Department holds a competition for new SSS grant once every five years, and accordingly, without relief, the Affected Programs will be unable to operate SSS projects until 2030 at the very soonest.

240.    Furthermore, the Affected Programs will be harmed at the time of that future grant competition because they will not be eligible to earn up to 15 prior experience points. Prior experience points are awarded to programs seeking to "continue" an "expiring" grant. *See* 34 C.F.R. § 646.20(a)(2)(i). When the Department invites applicants during the next SSS grant cycle, the Affected Programs will not be seeking to "continue" an "expiring" SSS grant because the Department denied their Applications in 2025.

241.    Additionally, the Affected Programs will be unable to seek an SSS grant in the same amount as their previous awards. With respect to the amount of a possible grant award, the 2024 NIA separated applicants into two groups: applicants who were currently receiving SSS grants, and applicants who were not currently receiving SSS grants. *See* 2024 NIA, 89 Fed. Reg. at 35,082.

242.    The Department estimated the range of awards to be from $148,181 to $1,659,366. For applicants without an existing SSS grant, the maximum award amount was $272,364 based on a different per participant expected cost that depends on the specific type of SSS program. For applicants currently performing an SSS Program grant, the maximum award amount is the greater

of (a) $272,364 or (b) 100 percent of the applicant's base award amount for FY 2024. *See* 2024 NIA, 89 Fed. Reg. at 35,082.

243.    Accordingly, the Affected Programs are effectively reset and will be treated as if they never operated SSS projects for purposes of future grant competitions.

244.    The harm to the Affected Programs also extends beyond the present inability to compete for a new grant and federal funding and the diminished ability to compete in the future. The Department has determined that the Affected Programs proposed to discriminate "on account of race" against their own students in violation of Title VI. This finding greatly damages the Affected Programs' reputations in their communities and will impact their ability to attract new students to SSS or otherwise. "[P]eople and entities receiving federal funding are shielded against being labeled with the 'irreversible stigma' of 'discriminator' until a certain level of agency process has determined that there was misconduct that warranted termination." *President & Fellows of Harvard Coll. v. U.S. Dep't of HHS*, No. 1:25-cv-11048 (ADB), 2025 WL 2528380, at *29 (D. Mass. Sept. 3, 2025) (internal citations omitted).

### c.    Harm to Students

245.    In addition to causing direct and irreparable harm to COE and the Affected Programs, the Department's denial of the Applications will cause irreparable harm to students that need support services.

246.    Students enrolled in SSS programs are all low income, first-generation, or disabled. Statistics show that SSS services make a meaningful difference in outcomes for a student population that genuinely needs support. *See* TRIO Fast Fasts, *supra* ¶ 42 ("After four years of college, SSS students were 48% more likely to complete an associate's degree or certificate or

transfer to a four-year institution," and "[a]fter six years of college, SSS students were 18% more likely to complete a bachelor's degree.").

247.    These students need these programs to succeed in their postsecondary education. Without them, qualified students will be at a higher risk of dropping out or otherwise not completing their degree programs.

### d.    No Harm to the Department

248.    Meanwhile, the Department will suffer no harm from a Court order directing it to reconsider and act upon the Applications through a lawful process as required by the HEA and the Department's regulations.

249.    As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted).

250.    Here, COE seeks a preliminary injunction ordering the Department to follow the federal laws and regulations that govern operation of the SSS program.

251.    Additionally, by denying these SSS applications, the federal interest in seeing that Pell Grants awarded to low-income students are used towards the cost of a postsecondary education may not be fully realized. Many students who qualify for participation in SSS projects based on income also qualify for Pell Grants, and without the Affected Programs' SSS projects, the United States would not see the full benefit of Pell Grant funding as these students may be more likely to drop out and/or face academic challenges.

## CAUSES OF ACTION

### Count I – Administrative Procedure Act
### Agency Action Contrary to Law and in Excess of Statutory Authority

252.    COE realleges and incorporates by reference the preceding allegations as though fully set out herein.

253.    The Department's denial decisions are final agency action that are subject to judicial review.

254.    The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," 5 U.S.C. § 702, and requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority," 5 U.S.C. §706(2)(A), (C).

255.    "The Administrative Procedure Act creates a basic presumption of judicial review for one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) (cleaned up). "Congress rarely intends to prevent courts from enforcing its directives to federal agencies. For that reason, this Court applies a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)).

256.    "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

257.    The Department acted in excess of its authority and contrary to law by not evaluating the Applications against the priorities in the 2024 NIA.

258.    The Department acted in excess of its authority and contrary to law because it treated the 2021 Final Priorities as having been replaced or excised by the 2025 Proposed Priorities, when the 2025 Proposed Priorities had not undergone the required notice-and-comment rulemaking.

259.    Accordingly, the Department could only rely on priorities that were established in the Federal Register or chosen from allowable activities in the authorizing statute.

260.    The Department stated in the denial letters that the Affected Programs' proposed activities "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law."

261.    The GEPA Equity Directive requires all grant applicants to address a number of topics relating to "equity." *See* 20 U.S.C. § 1228a(b).

262.    By evaluating the Applications using the wrong priorities, including those based on the new policies set forth in the DEI Executive Orders, the Department acted contrary to law and in excess of statutory authority.

263.    In denying the Applications because they included information and language that the GEPA Equity Directive requires, or using the DEI Executive Orders to deny Applications that included information and language that the GEPA Equity Directive requires, the Department acted contrary to law and in excess of statutory authority.

264.    COE is entitled to a declaration that the Department acted contrary to law and in excess of statutory authority, and a preliminary injunction directing the Department to immediately reconsider the Applications, in accordance with the final scores already awarded to the Affected Programs, and to proceed to act upon the Applications as required under the HEA, Title VI, the

applicable Department regulations, and the 2024 NIA. COE is further entitled to relief directing the Department to ensure that the Affected Programs are in the position they would have been in for the next SSS competition cycle with respect to prior experience points and the maximum award amount but for the Department's unlawful denial of their Applications.

**Count II – Administrative Procedure Act**
**Arbitrary and Capricious Agency Decision**

265.    COE realleges and incorporates by reference the preceding allegations as though fully set out herein.

266.    The Department's denial letters to the Affected Programs are final agency action that is subject to judicial review.

267.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary and capricious. *See* 5 U.S.C § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *See Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "In reviewing an agency's action under that standard, a court may not 'substitute its judgment for that of the agency.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)). "But it must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id*. (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

268.    The Department "cannot provide just any reason for its decision, that reason must be a change in the federal interest. [The agency] provides no evidence a change in the federal interest motivated its decision here." *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 660 (D. Md. 2018). Moreover, "the 'federal interest' does not necessarily mean 'the federal interest as

determined by [the agency].'" *Id.* at 660–61. "The ultimate touchstone for all agency action is not its own guidance documents, or even regulations, but the power delegated to it by Congress." *Id.*

269.    Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

270.    The Department's denial decision is arbitrary and capricious because it relied on new proposed priorities that Congress did not intend for it to consider.

271.    Congress did not intend for the Department to consider policies, including those set forth in the DEI Executive Orders, that had not gone through notice-and-comment rulemaking.

272.    The Department's decision is arbitrary and capricious because the Affected Programs in 2024 could not have anticipated the Department's new policies in 2025.

273.    Under the "change-in-position doctrine . . . agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917–18 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).

274.    The Department changed its position without providing any explanation or awareness of its change. The 2024 NIA expressly includes two competitive preference priorities. In denying the Applications, the Department changed its position regarding these priorities. The denial letters penalize Applications for addressing the competitive preference priorities listed in the 2024 NIA, and the letters sent to the Affected Programs provide no explanation of the reasoning behind the denials.

275.    In changing its position, the Department disregarded the Affected Programs' reliance interests. The Affected Programs had for years relied upon the Department's process

established by statute and regulation for making grant awards as part of its budgeting and financial planning, including with respect to staffing, infrastructure, facility and equipment purchases. Affected Programs submitted an Application according to the 2021 Final Priorities set forth in the 2024 NIA. In doing so, the Affected Programs relied on the accuracy of the 2024 NIA. By rejecting these Applications, the Department acted in an arbitrary and capricious manner.

276.    The Department's decision is arbitrary and capricious because it denied the Applications at the same time it awarded other applicants points for addressing the very same priorities in the 2024 NIA.

277.    The Department's denial decision is arbitrary and capricious because it retroactively applied new policies, and because those retroactively applied new policies had not undergone the required notice-and-comment rulemaking.

278.    "The APA, which prohibits arbitrary and capricious agency action and requires agencies to explain themselves when they change course, may separately limit the government's ability to impose retroactive conditions on grant awards." *Harris Cnty. v. Kennedy*, No. 25-cv-1275 (CRC), 2025 WL 1707665, at *10 (D.D.C. June 17, 2025).

279.    COE is entitled to a declaration that the Department's denial letters were arbitrary and capricious, and a preliminary injunction directing the Department to immediately reconsider the Applications, in accordance with the final scores already awarded to the Affected Programs, and to proceed to act upon the Applications as required under Title VI, the HEA, the applicable Department regulations, and the 2024 NIA. COE is further entitled to relief directing the Department to ensure that the Affected Programs are in the position they would have been in for the next SSS competition cycle with respect to prior experience points and the maximum award amount but for the Department's unlawful denial of their Applications.

**Count III – Administrative Procedure Act**
**Without Observance of Procedure Required By Law**

280.    COE realleges and incorporates by reference the preceding allegations as though fully set out herein.

281.    The APA further directs courts to hold unlawful and set aside agency actions that are without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(D).

282.    An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures, particularly if that error prejudices the interest of a person before the agency. *See Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 545–47 (6th Cir. 2004).

283.    When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 265, 268 (1954).

284.    "An agency has the duty to follow its own federal regulations," and "[f]ailure to follow applicable regulations can lead to reversal of an agency order." *Nelson v. Immig. & Naturalization Serv.,* 232 F.3d 258, 262 (1st Cir. 2000).

285.    The Department did not follow its procedures for refusing to grant the Affected Programs new SSS awards in numerous respects.

286.    The Department failed to notify the Affected Programs "at least 8 months prior to the expiration of the grant" under their prior 2020 SSS grants. 20 U.S.C. § 1070a-11(c)(7).

287.    The Department also failed to follow statutorily-required procedures. The Department failed to follow strict procedures under Title VI and 34 C.F.R. Part 100 before refusing to grant the Applications on the basis of an alleged Title VI violation. The Department failed to follow these procedures, including, but not limited to, by failing to advise the Affected Programs prior to their Application denial of their alleged noncompliance, by failing to seek their voluntary

compliance, by failing to determine that voluntary compliance could not be secured by voluntary means, and by not affording Affected Programs an opportunity for a hearing, before denying the Applications. *See* 34 C.F.R. §§ 100.6, 100.8, 100.9; 42 U.S.C. § 2000d-1.

288.    The Department's determination that the Affected Programs were in violation of Title VI injures them.

289.    The Department failed to follow strict procedures regarding the application scoring process.

290.    The Department failed to "ensure that the final score of an application, including prior experience points for high quality service delivery and points awarded through the peer review process, is determined in an accurate and transparent manner." § 403(a), 122 Stat. 3078, 3193; 20 U.S.C. § 1070a-11(g).

291.    The Department failed to follow strict procedures requiring it to make available peer-reviewed applications and scores to all applicants.

292.    The Department failed to follow strict procedures requiring it to afford applicants the opportunity to seek secondary review.

293.    The Department failed to follow strict procedures requiring that it evaluate the Applications based on "merit."

294.    COE is entitled to a declaration that the Department acted without observing the procedures in accordance with Title VI, the HEA, and the Department's regulations, and a preliminary injunction directing the Department to immediately reconsider the Applications, in accordance with the final scores already awarded to the Affected Programs, and to proceed to act upon the Applications as required under the HEA, Title VI, the applicable Department regulations, and the 2024 NIA. COE is further entitled to relief directing the Department to ensure that the

Affected Programs are put in the position they would have been in for the next SSS competition cycle with respect to prior experience points and the maximum award amount but for the Department's unlawful denial of their Applications.

**Count IV – Administrative Procedure Act**
**Failure to Follow Notice-and-Comment Rulemaking**

295.    "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*; *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 84 (D.D.C. 2007) ("The APA puts the agency to a simple either/or choice: either notice-and-comment procedures or the good-cause exception."); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule."); *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) ("Because EPA lacked good cause to dispense with required notice and comment procedures, we conclude the IFR must be vacated without reaching Petitioners' alternative arguments.").

296.    The Department is required under GEPA to follow the APA's notice-and-comment rulemaking procedure when changing the requirements for grant competitions. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

297.    No "good cause" exception applies to the Department's failure.

298.    In general, "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Am. Pub. Gas*

*Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1338 (D.C. Cir. 2023) (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002)).

299.    Without having proceeded through statutorily required notice-and-comment rulemaking procedures, the Department applied the Trump Administration's 2025 Proposed Priorities and the DEI Executive Orders when evaluating the Applications for New Awards and used those DEI Executive Orders to deny the Applications.

300.    COE is entitled to a declaration that the Department acted contrary to law and without observance of procedure, and a preliminary injunction vacating the Department's decision to deny the Applications and directing the Department to immediately reconsider the Applications, in accordance with the final scores already awarded to the Affected Programs, and to proceed to act upon the Applications as required under the HEA, Title VI, the applicable Department regulations, and the 2024 NIA. COE is further entitled to relief directing the Department to ensure that the Affected Programs are in the position they would have been in for the next SSS competition cycle with respect to prior experience points and the maximum award amount but for the Department's unlawful denial of their Applications.

### Count V – Administrative Procedure Act
### Violation of Constitutional Rights

301.    COE realleges and incorporates by reference the preceding allegations as though fully set out herein.

302.    The APA directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights. *See* 5 U.S.C. § 706(2)(B).

303.    Title IV of the HEA requires that the Secretary "shall" carry out the TRIO grant programs." 20 U.S.C. § 1070a-13, 14, 16.

304.    "Statutory language that an official 'shall' perform an act has been repeatedly held to be mandatory in nature. It deprives the official of discretion and makes the commanded act a duty, a ministerial act." *Com. of Pa. v. Weinberger*, 367 F.Supp. 1378, 1381 (D.D.C. 1973) (Commissioner of Education was required by statute to apportion to the states the full amount of appropriated funds for Parts A and C of Title V); *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d. 959, 991 (N.D. Ill. 2025) ("Congress expressly stated in the WANTO Act that the Executive 'shall' award grants for projects impacting women.").

305.    Congress's statutory directive is coupled with $1.19 billion in federal funds that Congress appropriated to the Department for this fiscal year via the 2025 CR to perform its duty to carry out the SSS and other TRIO programs.

306.    The Executive Branch "does not have unilateral authority" to refuse to spend funds appropriated by Congress. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Indeed, it is axiomatic that "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

307.    After a bill becomes law, the President is required to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5, and "agencies are there to serve that same end," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

308.    Upon information and belief, the Department has not obligated and expended $1.19 billion towards all TRIO programs, and has not obligated and expended the funds allocated to the SSS program in the manner required under law.

309.    "The D.C. Circuit has made clear that 'the President does not have unilateral authority to refuse to spend' based solely on policy reasons." *Harris Cnty.*, 2025 WL 1707665, at *8; *id.* ("The government cites no authority for its contention that appropriations statutes require agencies merely to obligate, rather than spend, appropriated funds."). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco*, 897 F.3d at 1233–34.

310.    The Department has violated the Spending Clause by refusing to obligate and spend fiscal year 2025 funds for the SSS program. *Cf. Harris Cnty.*, 2025 WL 1707665, at *10 ("[T]he Court will assume without deciding for the purposes of this motion that the Spending Clause also prohibits the Executive Branch from imposing retroactive conditions on grant awards.").

311.    "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *See City & Cnty. of San Francisco*, 897 F.3d at 1235 (explaining that without authorization from Congress, "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

312.    Under "settled, bedrock principles of constitutional law," the President, and by extension the Department, "must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *Aiken County*, 725 F.3d at 259 (emphasis omitted). And if the authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds "simply because of policy objections." *Id.*

313.    The Department cannot withhold any of the $1.19 billion in fiscal year 2025 funds appropriated by Congress for carrying out the SSS and other TRIO based on the Executive Branch's policy objections. *Cf. Harris Cnty.*, 2025 WL 1707665, at \*10 ("[T]he Court will assume without deciding for the purposes of this motion that the Spending Clause also prohibits the Executive Branch from imposing retroactive conditions on grant awards.").

314.    COE is entitled to a declaration that the Department has violated the Constitution's Take Care and Spending Clauses, and a preliminary injunction directing the Department to immediately reconsider the Applications, in accordance with the final scores already awarded to the Affected Programs, and to proceed to act upon the Applications as required under the HEA, Title VI, the applicable Department regulations, and the 2024 NIA. COE is further entitled to relief directing the Department to ensure that the Affected Programs are in the position they would have been in for the next SSS competition cycle with respect to prior experience points and the maximum award amount but for the Department's unlawful denial of their Applications.

## **Count VI – Ultra Vires**

315.    COE realleges and incorporates by reference the preceding allegations as though fully set out herein.

316.    A claim seeking *ultra vires* review is available where (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim and (3) the challenged action is "plainly" in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

317.    The Department's actions are plainly in excess of its delegated powers and are contrary to the clear and mandatory duties under Title VI, the HEA, the associated regulations, and the 2024 NIA.

318.    Review of these claims is not precluded by any statute. To the extent no relief is available under the forgoing causes of action, COE seeks *ultra vires* review of the Department's actions.

319.    COE is entitled to a declaration that the Department and the Secretary acted *ultra vires* in excess of statutory authority. COE is further entitled to a preliminary and permanent injunction ordering the Department to immediately reconsider the Applications, in accordance with the final scores already awarded to the Affected Programs, and to proceed to act upon the Applications as required under the HEA, Title VI, the applicable Department regulations, and the 2024 NIA. COE is further entitled to relief directing the Department to ensure that the Affected Programs are in the position they would have been in for the next SSS competition cycle with respect to prior experience points and the maximum award amount but for the Department's unlawful denial of their Applications.

## **Count VI – Writ of Mandamus**

320.    To the extent no relief is available under the foregoing causes of action, COE pleads in the alternative that it is entitled to a writ of mandamus ordering the Department to immediately reconsider and act upon the Applications, consistent with its duties under applicable law and regulations.

321.    The Department (and the Secretary) are officers, employees, or agencies of the United States. "The district courts shall have original jurisdiction of any action in the nature of

mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

322.    The relief sought as to the Department is necessary and appropriate to aid in the jurisdiction of this Court and agreeable to the usages and principles of law. "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

323.    The Department violated and is continuing to violate Title VI, the HEA, and its own regulations by denying the Applications based on proposed, not final priorities, and applying them retroactively to deny without the required due process.

324.    The Department's violations have caused extraordinary and ongoing harm to COE and its Affected Programs for which no adequate alternative remedy exists.

## PRAYER FOR RELIEF

COE seeks the following relief:

a.    An order and declaration that the Department's denial of the Affected Programs' Applications was in excess of statutory authority and contrary to law;

b.    An order and declaration that the Department's denial of the Affected Programs' Applications was arbitrary and capricious;

c.    An order and declaration that the Department's denial of the Affected Programs' Applications was not in observance of procedure required by law;

d.    An order and declaration that the Department's denial of the Affected Programs' Applications based on 2025 Proposed Priorities and/or policies set forth in the DEI Executive Orders, which had not undergone the required notice and comment rulemaking and which conflicted with the 2021 Final Priorities, constituted actions taken contrary to law and without observance of required procedure;

e.    An order and declaration that the Department's denial of the Affected Programs' Applications and failure to spend all of the required $1.19 billion in

fiscal year 2025 funds was in violation of the Take Care and Spending Clauses of the U.S. Constitution;

f.  An order and declaration that the Department's denial of the Affected Programs' Applications constituted *ultra vires* actions in excess of statutory authority;

g.  In the alternative, a writ of mandamus ordering and declaring that the Department's denial of the Affected Programs' Applications were in violation of the HEA, Title VI, the applicable Department regulations, and the 2024 NIA;

h.  A preliminary injunction ordering the Department to immediately reconsider the Applications, and thereafter proceed to act upon such Applications and to award new grants to the Affected Programs according to each Application's peer reviewed score, as adjusted by the Secretary for prior experience, in accordance with all applicable laws, regulations, and procedures under the HEA, Title VI, the applicable Department regulations, and the 2024 NIA;

i.  A preliminary injunction extending the period of availability for fiscal year 2025 funds, beyond September 30, 2025, for any remaining unobligated fiscal year 2025 funds of the $3,080,952,000 that Congress appropriated to the Department's Higher Education budget account, without prior notice and approval from the Court, and further, prohibiting the Department from obligating or spending any such remaining unobligated funds without notice and Court approval, and further, directing that the funds will not be considered lapsed as of October 1, 2025, and further, directing the Department to provide an accounting of all such funds, that have been obligated and unobligated, spent or unspent, and the purposes for which the funds have been obligated and spent;

j.  A preliminary injunction prohibiting the Department in the future from denying or termination federal financial assistance to Plaintiff's Affected Programs without satisfying the requirements under Title VI of the Civil Rights Act of 1964;

k.  An order directing the Department to ensure that the Affected Programs are in the position they would have been in during the next SSS competition cycle but for the Department's unlawful denial decisions, including by awarding prior experience points to the Affected Programs and by setting their maximum award amounts no lower than their fiscal year 2024 award amounts;

l.  An order awarding COE its attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

m.  Any further relief as the Court may deem just and proper.

Dated: September 29, 2025          Respectfully submitted,

**THOMPSON COBURN LLP**

/s/ *[signature]*

Jayna Marie Rust (D.C. Bar No. 998326)
1909 K Street N.W., Suite 600
Washington, D.C. 20006
P.       (202) 585-6929
E.       jrust@thompsoncoburn.com

Brandt P. Hill (*Pro hac vice* forthcoming)
Lorrie L. Hargrove (*Pro hac vice* forthcoming)
2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
P.       (205) 769-4303
E.       bhill@thompsoncoburn.com
         lhargrove@thompsoncoburn.com

*Attorneys for Council for Opportunity in Education*