## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **COUNCIL FOR OPPORTUNITY** | ) | |
| **IN EDUCATION**, 1025 Vermont Avenue | ) | |
| NW, Suite 400, Washington, D.C., 20005, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 25-cv-3491 |
| v. | ) | |
| | ) | |
| **U.S. DEPARTMENT OF EDUCATION** | ) | |
| **and LINDA MCMAHON**, 400 Maryland | ) | |
| Avenue SW, Washington, D.C. 20202 | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF COUNCIL FOR OPPORTUNITY IN EDUCATION'S MOTION FOR
PRELIMINARY INJUNCTION WITH MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION PRELIMINARY INJUNCTION**

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Plaintiff Council for Opportunity in Education ("**<u>COE</u>**") respectfully moves for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, seeking immediate relief due to the actions of Defendants U.S. Department of Education (the "**<u>Department</u>**" or "**<u>ED</u>**") and Linda McMahon, in her official capacity as Secretary of Education (the "**<u>Secretary</u>**").[1]

The Department recently denied COE members' applications for new federal education grants that they submitted to the agency in 2024. In boilerplate letters sent to the applicants this summer, the Department said that it had examined their applications and identified information indicating that their proposed grant activities "take account of race" in violation of Title VI. The Department concluded that such activities "conflict with the Department's policy" and its "commitment to uphold the letter and purpose of Federal civil rights law."

In doing so, the Department erred many times over. It impermissibly based its denial decision on new policies that did not undergo mandatory notice-and-comment rulemaking; retroactively applied policies in 2025 to evaluate applications submitted in 2024; ignored the policies, priorities, and regulations that did apply to the grant; penalized the applicants for statements that federal law requires be included in grant applications; and in some instances, penalized applicants for discussing topics the Department explicitly encouraged them to address. The Department, additionally, bypassed the steps that must be taken *before* a federal agency can refuse to provide federal financial assistance based on Title VI noncompliance. Further, the Department disregarded the carefully-crafted regulatory scheme for the scoring and grant award process. The Department's denial decisions violate the Administrative Procedure Act, the Higher

---

[1] This Motion and accompanying brief refer to the Department and the Secretary collectively as "the Department" unless specified otherwise.

Education Act of 1965, Title VI, the Department's regulations and past practices, and the Constitution. COE is likely to succeed on these claims.

COE and its members whose applications for these grants (the "**Applications**") were denied (the "**Affected Programs**") are suffering immediate harm. The Affected Programs have been denied a fair opportunity to compete for these grants on the basis required under law and on the same footing as other applicants. The public interest favors the Department's compliance with the law, and the Department will not be harmed by a preliminary injunction that vacates the denial decisions and directs the Department to immediately reconsider the Applications and act upon them by awarding new grants to the Affected Programs based on the scores their Applications already received. Without relief, the Affected Programs will close, harming them, COE, and the students they all serve irreparably. In short, all the elements necessary for preliminary injunction are present. Further support for this motion follows in a memorandum of points and authorities.

# TABLE OF CONTENTS

**Page**

BACKGROUND ............................................................................................................... 1

I.    Legal Background of the federal TRIO grant programs ..................................... 1

    A.    Congress creates grant programs to support disadvantaged college students......... 1

    B.    Congressional appropriations for TRIO programs ......................................... 1

    C.    The SSS program .................................................................................... 2

    D.    Federal laws applicable to SSS ................................................................. 3

    E.    The Department's process for evaluating, scoring, and awarding new SSS grants 3

    F.    Title VI's required procedures for refusing to provide federal financial aid based on alleged noncompliance................................................................. 6

II.    Factual Background ............................................................................................ 7

    A.    In 2024, the Department invited applications for new SSS grants ........................ 7

    B.    The Trump Administration's new policies and priorities..................................... 10

    C.    The Department denies the Affected Programs' Applications ............................. 12

ARGUMENT ................................................................................................................ 14

I.    COE has demonstrated a substantial likelihood that it has both organizational and associational standing to sue. ..................................................................... 14

    A.    COE has organizational standing to sue .................................................. 14

    B.    COE has associational standing to sue................................................. 17

II.    The Court has jurisdiction over COE's claims. ............................................... 19

    A.    The APA's waiver of sovereign immunity ......................................... 19

    B.    The Tucker Act does not bar COE from bringing these claims in this Court. ...... 19

    C.    Title VI's waiver of sovereign immunity ........................................... 22

    D.    The *Larson-Dugan* exception to sovereign immunity .......................... 23

III.    COE has satisfied all the requirements for the Court to issue a preliminary injunction... 23

    A.    COE has established a likelihood of success on the merits ................................. 23

        1.    The APA and final agency action ........................................... 24

            a.    Contrary to law, in excess of statutory authority, and without observance of procedure under 5 U.S.C. § 706(2)(A), (C), and (D) (Counts I, III, and IV) ................................................................. 25

                i.    The Department failed to follow the required procedures to deny grant funding under Title VI. ................................... 26

|  | ii. | The Department evaluated the Applications using the wrong priorities. | 26 |
|  | iii. | The Department failed to follow statutorily-required notice-and-comment for its new priorities. | 27 |
|  | iv. | The Department retroactively applied the 2025 Final Priorities. | 28 |
|  | v. | The Department failed to provide secondary review. | 29 |
| b. | Arbitrary and capricious agency action (Count II) | | 29 |
|  | i. | The Department relied on improper factors when deciding the Affected Programs' Applications and gave no explanation. | 30 |
|  | ii. | The Department changed its position with no explanation. | 31 |
| c. | Violation of constitutional rights under the APA (Count V) | | 33 |
| 2. | Ultra vires (Count VI) | | 34 |
| 3. | Writ of mandamus under 28 U.S.C. § 1361 (Count VII) | | 35 |
| B. | COE will suffer irreparable harm without an injunction | | 36 |
| C. | The balance of equities favors COE | | 41 |
| D. | No bond should be required | | 41 |
| **CONCLUSION** | | | **41** |
| **CERTIFICATE OF SERVICE** | | | **43** |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ...................................................................................24

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach,*
    469 F.3d 129 (D.C. Cir. 2006) ....................................................................................14

*Adams v. Bell,*
    711 F.2d 161 (D.C. Cir. 1983) (Wright, J., dissenting) .............................................22

*AFL-CIO v. Chao,*
    496 F. Supp. 2d 76 (D.D.C. 2007) ..............................................................................28

*In re Aiken Cnty.,*
    725 F.3d 255 (D.C. Cir. 2013) ....................................................................................33

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.,*
    946 F.3d 615 (D.C. Cir. 2020) ..............................................................................14, 15

*Am. Library Ass'n v. F.C.C.,*
    406 F.3d 689 (D.C. Cir. 2005) ....................................................................................17

*American Assoc. of Physc. Teachers, Inc. v. Nat'l Sci. Found.,*
    No. 1:25-cv-1923, 2025 WL 2615054 (D.D.C. Sept. 10, 2025)..................................37

*Bennett v. Spear,*
    520 U.S. 154 (1997)......................................................................................................24

*California v. Dep't of Educ.,*
    145 S.Ct 966 (2025)........................................................................................20, 21, 31

*Changji Esquel Textile Co. v. Raimondo,*
    40 F.4th 716 (D.C. Cir. 2022) ....................................................................................33

*Chicago Women in Trades v. Trump,*
    778 F. Supp. 3d. 959 (N.D. Ill. 2025) .........................................................................32

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ....................................................................................33

*City of Houston v. HUD,*
    24 F.3d 1421 (D.C. Cir. 1994) ......................................................................................2

*Climate United Fund v. Citibank, N.A.*,
No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025)....................................32

*Colwell v. Dep't of HHS*,
558 F.3d 1112 (9th Cir. 2009) ...............................................................................22

*Com. of Pa. v. Weinberger*,
367 F.Supp. 1378 (D.D.C., 1973) ..........................................................................32

*Commc'ns & Control, Inc. v. FCC*,
374 F.3d 1329 (D.C. Cir. 2004) .............................................................................31

*Cox v. Kijakazi*,
77 F.4th 983 (D.C. Cir. 2023).........................................................................28, 29

*Crowley Gov't Servs., Inc. v. GSA*,
38 F.4th 1099 (D.C. Cir. 2022)..............................................................................19

*Dalton v. Specter*,
511 U.S. 462 (1994)................................................................................................32

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................................................................................................29

*Dugan v. Rank*,
372 U.S. 609 (1963)................................................................................................23

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017)................................................................................15

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*,
No. 25-cv-1458, 2025 WL 1865971 (D. Md. July 7, 2025) ...................................25

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009)................................................................................................31

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)................................................................................................30

*Global Health Council v. Trump*,
No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025)...........................32, 37

*Goodluck v. Biden*,
104 F.4th 920 (D.C. Cir. 2024).................................................................................2

*Harris Cnty. v. Kennedy*,
No. 1:25-cv-1275, 2025 WL 1707665 (D.D.C. June 17, 2025) .............................19

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ..................................................................................15, 16

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ................................................................28

*Hunt v. Wash. State Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ...............................................................................17

*Illinois v. Ferriero*,
    60 F.4th 704 (D.C. Cir. 2023) ................................................................34

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
    477 U.S. 274 (1986) ...............................................................................18

*John T. v. Delaware Cnty. Intermediate Unit*,
    No. 98-cv-5781, 2000 WL 558582 (E.D. Pa. May 8, 2000) .......................35

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ................................................................40

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) ...............................................................................23

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ...............................................................................25

*Mack Trucks, Inc. v. EPA*,
    682 F.3d 87 (D.C. Cir. 2012) ................................................................28

*Maine Community Health Options v. United States*,
    590 U.S. 296 (2020) ..........................................................................20, 21

*Martin Luther King, Jr. Cnty. v. Turner*,
    2025 WL 2322763 (W.D. Wash. 2025) ....................................................29

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
    103 F.4th 830 (D.C. Cir. 2024) ...............................................................19

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) ..............................................................25

*Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................30

*MSP Recovery Claims, Series LLC v. Pfizer, Inc.*,
    728 F. Supp. 3d 89 (D.D.C. 2024) ..........................................................15

*Nat'l Assoc. of Postal Supervisors v. U.S. Postal Serv.*,
  26 F.4th 960 (D.C. Cir. 2022) ................................................................. 33

*In re Nat'l Nurses United*,
  47 F.4th 746 (D.C. Cir. 2022) ................................................................. 34

*Nat'l Treasury Emps. Union v. IRS*,
  No. 04-cv-0820, 2006 WL 416161 (D.D.C. Feb. 22, 2006) ...................... 15

*Nat'l Treasury Emps. Union v. Vought*,
  No. 25-cv-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ................. 32

*New York v. McMahon*,
  784 F. Supp. 3d 311 (D. Mass. 2025) ............................................... 35, 39

*Pollack v. Hogan*,
  703 F.3d 117 (D.C. Cir. 2012) ................................................................. 24

*President & Fellows of Harvard Coll. v. U.S. Dep't of HHS ("Harvard v. HHS")*,
  No. 25-cv-10910, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ............ 22, 23, 38

*Refugee and Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
  No. 1:25-cv-306, 2025 WL 1825431 (D.C.C. July 2, 2025) ..................... 15

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ................................................................. 17

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ................................................................................. 25

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996) ................................................................................. 17

*Will v. United States*,
  389 U.S. 90 (1967) ................................................................................... 34

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................. 38

**Statutes**

5 U.S.C. § 553 ............................................................................................. 4

5 U.S.C. § 706(2) .................................................................................. 24, 25

20 U.S.C. § 1070a-11 ........................................................................ *passim*

20 U.S.C. § 1070a-14(a) .............................................................................. 3

20 U.S.C. § 1221 ..................................................................................................3, 4

20 U.S.C. § 1228a(b) ...............................................................................................3

20 U.S.C. § 1232(d) ...............................................................................................28

28 U.S.C. § 1361 ...................................................................................................33

42 U.S.C. § 2000d.......................................................................................... *passim*

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235 ..............................................................................................................1, 2

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (2022) .......................2

Economic Opportunity Act of 1964, Pub. L. No. 88-452 ...........................................1

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 (2025) ..............................................................................................................2

Further Consolidated Appropriations Act, 2020 Pub. L. No. 116-941 (2019) .............2

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 (2024) ..............2

Higher Education Act of 1965, Pub. L. No. 89-329 ....................................................1

**Other Authorities**

34 C.F.R. Part 75..........................................................................................*passim*

34 C.F.R. Part 100..........................................................................................7, 26, 27

34 C.F.R. § 100.4, 104.5, 106.4, 108.8, and 110.23 ...............................................10

34 C.F.R. § 100.6 ..................................................................................................26

34 C.F.R. § 100.8(c) ..............................................................................................26

34 C.F.R § 100.9(b), 100.10 ..................................................................................26

34 C.F.R. § 217 ...................................................................................................4, 27

34 C.F.R. Part 646................................................................................................4

34 C.F.R. § 646.5 ..................................................................................................7

34 C.F.R. § 646.24 .......................................................................................*passim*

34 C.F.R. § 646.20–22 ..................................................................................*passim*

84 Fed. Reg. 68,915 (Dec. 19, 2019) ...........................................................................7

86 Fed. Reg. 70,612 (Dec. 10, 2021) ...........................................................................8

87 Fed. Reg. 47,733 (Aug. 4, 2022).............................................................................9

89 Fed. Reg. 35,080 (May 1, 2024) ....................................................................8, 9, 38

90 Fed. Reg. 21,710 (May 21, 2025) ....................................................................11, 28

90 Fed. Reg. 43,514 (Sept. 9, 2025) .............................................................12, 28, 29

ED, GEPA Notice to All Applicants..............................................................................9

Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs
    and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ..........................................10

Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based
    Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025)....................................................10

Exec. Order No. 14242, *Improving Education Outcomes by Empowering Parents,
    States, and Communities*, 90 Fed. Reg. 13,679 (Mar. 20, 2025) .....................10, 11

Federal Rule of Civil Procedure 65(c) .......................................................................40

Exec. Order No. 13985, *Advancing Racial Equity and Support for Underserved
    Communities Through the Federal Government* .......................................................9

# BACKGROUND

## I.    Legal Background of the federal TRIO grant programs

### A.    Congress creates grant programs to support disadvantaged college students

In the wake of the War on Poverty, the federal government in the 1960s established a number of safety net programs to support poor communities across America. Among them was a "trio" of educational grant programs designed to help low-income, first-generation college students pursue a college education. The first two programs, Upward Bound and Talent Search, were authorized in 1964 and 1965, respectively. *See* Economic Opportunity Act of 1964, Pub. L. No. 88-452, § 2, 78 Stat. 508, 508 (creating program known today as Upward Bound); Higher Education Act of 1965, Pub. L. No. 89-329, § 408, 79 Stat. 1235–36 (creating program known today as Talent Search). A few years later, Congress authorized the program at issue here. Originally "Special Services for Disadvantaged Students," the program was renamed to Student Support Services ("**SSS**") in 1986. *See* Education Amendments of 1968, Pub. L. No. 90-575, § 105(a), 82 Stat. 1014, 1018; Higher Education Amendments of 1986, Pub. L. No. 99-498, § 401(a), 100 Stat. 1268, 1339. The three initial TRIO programs later expanded to include five other programs. *See* 20 U.S.C. §§ 1070a-11 to 18. All the TRIO programs share a common goal: to help disadvantaged students, including low-income students, first-generation college students, and students with disabilities, prepare for and graduate from college.

### B.    Congressional appropriations for TRIO programs

TRIO programs today are funded in annual discretionary spending bills.[2] For fiscal year 2024, Congress appropriated at least $1.19 billion to the TRIO programs as part of the Higher

---

[2] *See* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. g, tit. III, 128 Stat. 2130, 2501–02 (2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. h, tit. III, 129 Stat. 2242, 2635 (2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. h, tit. III, 131 Stat. 135, 549–50; Consolidated Appropriations Act, 2018, Pub. L. No. 115–141, div. h, tit. III, 132 Stat. 348, 747; Department of

Education budget account. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. d, tit. III, 138 Stat. 460, 689 (2024). For fiscal year 2025, Congress passed and President Trump signed a continuing resolution that level funded TRIO programs. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) (the "2025 CR"). The last day of the 2025 fiscal year is today—Tuesday, September 30, 2025.[3]

### C.     The SSS program

Not much has changed about the SSS program since 1968. The Department is required to award five-year grants to institutions of higher education or groups of institutions. 20 U.S.C. § 1070a-11(a)(2); *id.* § 1070a-14. Institutions awarded an SSS grant operate projects at their locations and are required to provide certain support services to eligible students, including academic tutoring, counseling, assistance applying for financial aid, and other services. Eligible students include individuals with disabilities, low-income students, and first-generation college students. Congress's stated purpose for SSS is to increase students' college retention and graduation rates, increase transfer rates from 2- to 4-year institutions, improve financial and economic literacy, and to foster an institutional climate that supports them. *See* 20 U.S.C. § 1070a-

Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. b, tit. III, 132 Stat. 3102–03 (2018); Further Consolidated Appropriations Act, 2020 Pub. L. No. 116-94, div. a, tit. III, 133 Stat. 2534, 2593 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. h, tit. III, 134 Stat. 1182, 1605 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. h, tit. III, 136 Stat. 49, 481–82 (2022); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, tit. III, 136 Stat. 4894–95 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. d, tit. III, 138 Stat. 460, 689 (2024).

[3] It is unknown whether the Department has obligated the full amount of fiscal year 2025 funds that Congress appropriated to the Higher Education account or whether any funds remain. In any event, although a new federal fiscal year starts on October 1, any funds that Congress appropriated for fiscal year 2025 that the Department has not obligated and spent will not lapse and will remain available for obligation until this case is resolved. *See Goodluck v. Biden*, 104 F.4th 920, 927–28 (D.C. Cir. 2024) ("[I]n the appropriations context, Congress has expressly authorized courts to suspend the lapse of budget authority while lawsuits play out." (quoting 31 U.S.C. § 1502(b)); *id.* ("We have held that a court may 'award funds based on an appropriation even after the date when the appropriation lapses, so long as the lawsuit was instituted on or before that date.'" (quoting *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (cleaned up)); *City of Houston*, 24 F.3d at 1427 ("[T]o avoid having its case mooted, a plaintiff must both file its suit before the relevant appropriation lapses *and* seek a preliminary injunction preventing the agency from disbursing those funds.") (emphasis in original).

14(a). Studies show that SSS students outperform their peers and are exceeding program objectives. *See* ED, FY 2026 Budget Request, at 89–91.[4]

### D.     Federal laws applicable to SSS

Several federal laws apply to SSS and other TRIO programs, and two are important here. First is the General Education Provisions Act ("**GEPA**"). *See* 20 U.S.C. § 1221. SSS is an "applicable program" under GEPA, and the Department must require that all grant applicants address equity issues in their applications. *Id.* §§ 1221(b) & (c)(1). Specifically, GEPA requires that applicants:

> develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

20 U.S.C. § 1228a(b).

Second is Title VI. *See* 42 U.S.C. § 2000d. Title VI prohibits discrimination on the basis of race, color, or national origin in any program receiving federal financial assistance. *Id*. All applicants must provide assurances that they will comply with it. *See* 34 C.F.R. § 75.500(a).

### E.     The Department's process for evaluating, scoring, and awarding new SSS grants

The grantmaking process for the SSS program begins when the Department announces a grant "competition" and publishes a notice of invitation to apply for the grant in the Federal Register. 34 C.F.R. § 75.105(b)(1)–(2). The notice outlines the application and award process and includes important dates and information.

---

[4] *Available at* https://ed.gov/media/document/fy-2026-congressional-justification-higher-education-110154.pdf.

Among other things, a notice describes the "selection criteria" and any "priorities" that applicants will be evaluated and scored against. "Selection criteria" are based on the SSS authorizing statute, SSS program regulations, and the Department's discretionary grantmaking regulations. *See* 20 U.S.C. §§ 1070a-11; 34 C.F.R. Part 646; 34 C.F.R. Part 75. The "priorities" contain the Department's objectives and goals for the grant. Under GEPA, selection criteria and priorities must go through APA notice-and-comment rulemaking. 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); 5 U.S.C. § 553. GEPA ensures that applicants have notice of the rules that the Department uses for grantmaking. Notably, notice-and-comment rulemaking did not happen here.

The Department relies on a panel of at least three peer reviewers to evaluate each application against the notice's selection criteria and priorities and assign an application a total score. 20 U.S.C. § 1070a-11(g). Peer reviewers are subject-matter experts and are not employed by the federal government. The peer reviewers' scores are then averaged. 34 C.F.R. § 646.20–22; 34 C.F.R. § 75.200; 34 C.F.R. § 217.

The Secretary adjusts the average score based on an applicant's "prior experience" operating a SSS project under an existing SSS grant, taking into account the applicant's performance in meeting project objectives during each of the three years designated in the notice. *See* 34 C.F.R. § 646.22(e)(1)–(5). Applicants are then ranked according to their final scores, and grants are awarded in the order of highest scoring applicants until all funds allocated to the Department for SSS have been obligated. Per 20 U.S.C. § 1070a-11(c)(3), the Secretary "shall award grants and contracts under this division in the order of the scores received by the application for such grant or contract in the peer review process . . . and adjusted for prior experience."); *see also* Discretionary Grantmaking at ED, at 27 ("[The Department] uses the scores determined by

non-Federal reviewers to make funding determinations.").[5] The Secretary is directed to "ensure that the final score of an application, including prior experience points for high quality service delivery and points awarded through the peer review process, is determined in an accurate and transparent manner." 20 U.S.C. § 1070a-11(g).

Once the scoring process is complete, the Secretary notifies the first "slate" of applicants that have been selected for a new grant. The Secretary also notifies "each unsuccessful applicant in writing as to the status of its application . . . and provides copies of the peer reviewers' evaluations of the applicant's application and the applicant's PE score." 34 C.F.R. § 646.24(c)(3); *see also* ED, *Getting Started with Discretionary Grant Applications* ("All applicants will receive a copy of the Technical Review Form completed by their peer reviewer panel. The form contains scoring information and identified strengths and weaknesses to improve future applications.").[6]

The Department "sets aside" a portion of funds to allocate to applicants not selected during the first slate but that are eligible to request "secondary review." These applicants must have scored high enough to fall within a "funding band." 20 U.S.C. § 1070a-11(8)(C)(i); 34 C.F.R. 646.24(c) ("For each competition, the Secretary establishes a funding band for the second review of applications."); *id.* ("The Secretary establishes the funding band . . . based on the amount of funds the Secretary has set aside for the second review of applications."). Per SSS regulations, "the Secretary notifies each unsuccessful applicant . . . of the funding band for the secondary review." 34 C.F.R. § 646.24(c)(3). "An application that scored below the established funding band for the competition is not eligible for a second review." 34 C.F.R. § 646.24(e).

---

[5] *Available at* https://www.ed.gov/media/document/grantmaking-ed-108713.pdf. One exception, not relevant here, is that the Secretary does not award a new grant "to an applicant if the applicant's prior project involved the fraudulent use of program funds." 34 C.F.R. § 646.20(d); 20 U.S.C. § 1070a-11.

[6] *Available at* https://ed.gov/grants-and-programs/apply-grant/getting-started-discretionary-grant-applications.

The statute and regulations set forth a detailed process for what applicants in the funding band must demonstrate to be selected for a grant following the secondary review process. *See* 20 U.S.C. § 1070a-11(c)(8)(C)(iv)(V)(aa)–(bb); 34 C.F.R. § 646.24(b). Generally, an application must offer "evidence of a specific technical, administrative, or scoring error made by the Department, an agent of the Department, or a peer reviewer, with respect to the scoring or processing of a submitted application." 20 U.S.C. § 1070a-11(8)(C)(i). "The Secretary's determination of whether the applicant has met the requirements for a second review and the Secretary's decision on re-scoring of an application are final and not subject to further appeal or challenge." 34 C.F.R. § 646.24(e).

### F. Title VI's required procedures for refusing to provide federal financial aid based on alleged noncompliance

As noted above, applicants for and recipients of SSS grants are subject to Title VI's prohibition on discrimination based on race, national origin, and other protected characteristics. *See* 42 U.S.C. § 2000d-1. Title VI provides federal agencies an enforcement mechanism for compliance by refusing to provide (or terminating existing) federal financial assistance, but requires they take certain steps first.

Specifically, under Title VI, no action refusing to provide federal funds "shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with [Title VI] and has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1. If the agency cannot secure voluntary compliance with Title VI, then it may refuse to provide (or terminate) funding. But refusing to provide funding requires "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement." *Id*. In addition, the agency "shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report

of the circumstances and the grounds for such action." *Id.* Any agency action refusing to provide (or terminating) financial assistance does not "become effective until thirty days have elapsed after the filing of such report." *Id.* Title VI further provides for judicial review of agency decisions "refusing to grant . . . financial assistance upon a finding of failure to comply with" Title VI in federal district court under the APA. 42 U.S.C. § 2000d-2. These statutory requirements are mirrored by the Department's accompanying Title VI regulations. 34 C.F.R. § 75.500(a); *id.* 34 C.F.R. Part 100 (setting forth detailed mechanism to "effectuate the provisions of title VI"); *see also id.* § 100.1, 100.4, 104.5, 106.4, 108.8, & 110.23.

## II.    Factual Background

COE is a 501(c)(3) nonprofit organization that is dedicated to furthering the expansion of educational opportunities for disabled, low-income, and first-generation college students in the United States who are served by the SSS and other TRIO programs. *See* Declaration of Kimberly Jones, ¶¶8–9 (hereinafter, "**COE Decl.**"), attached as Ex. 1.

### A.    In 2024, the Department invited applications for new SSS grants

Following a SSS grant competition initiated in 2019,[7] the Department in 2020 awarded 1,155 new SSS grants to successful applicants. The Affected Programs were among them. *See* Declaration of Sarah C. Postel, ¶¶13–14 ("**Green River Decl.**"), attached as Ex. 2; Declaration of Veronica Guadarrama (STEM), ¶¶13–14 ("**Big Bend Decl.**"), attached as Ex. 3;[8] Declaration of Renada Greer, ¶¶14-15 ("**SIU-Carbondale Decl.**"), attached as Ex. 4.

Although SSS grants are awarded for five-year periods, the Department distributes funds in 12-month "budget periods." 34 C.F.R. § 75.251(b)(1)-(2); 20 U.S.C. § 1070a-11(b)(2); 34

---

[7] *See* Applications for New Awards—Student Support Services Program, 84 Fed. Reg. 68,915 (Dec. 19, 2019).

[8] Big Bend Community College also operates an SSS Classic project in addition to its SSS STEM project. *See* Declaration of Veronica Guadarrama (Classic), attached as Ex. 3-1.

C.F.R. § 646.5. Funding each budget period is conditioned on the recipient meeting performance and reporting obligations. Provided these conditions are satisfied, the Department issues a "continuation award" for the following budget period. 34 C.F.R. § 75.253(a). The Affected Programs satisfied these requirements throughout the five-year grant period. *See* Green River Decl. ¶¶18–19; Big Bend Decl. ¶¶18–19; SIU-Carbondale Decl. ¶¶19–20. Their 2020 grants expired on their own terms on August 31, 2025. *See* Department of Education, SSS Grantees.[9]

Consistent with historical practice, the Department in 2024 announced a competition for new SSS grants to be awarded in 2025, ensuring continuity and no lapse in funding for existing grantees. *See* 20 U.S.C. § 1070a-11(c)(7). On May 1, 2024, the Department published a notice of invitation for new SSS grant applications for fiscal year 2025. *See* Notice Inviting Applications—Student Support Services Program, 89 Fed. Reg. 35,080 (May 1, 2024) ("**2024 NIA**"). Along with the 2024 NIA, the Department issued an application package with instructions for applicants. *See* ED, FY 2025 Application for Grants Under the Student Support Services Program ("**Application Package**").[10]

Consistent with the process detailed above, the 2024 NIA described the applicable selection criteria and priorities, and notified applicants of the deadline to apply. The selection criteria were based on "34 CFR 646.21 and 75.210." *Id.*

The 2024 NIA also contained two competitive preference priorities that the Department had previously published in 2021. *See* Final Priorities and Definitions, 86 Fed. Reg. 70,612 (Dec. 10, 2021) ("**2021 Final Priorities**").

---

[9] *Available at* https://www.ed.gov/media/document/fy-2024-sss-awards-109464.pdf.

[10] *Available at* https://apply07.grants.gov/apply/opportunities/instructions/PKG00286185-instructions.pdf.

The first competitive preference priority in the notice is titled, "Meeting Student Social, Emotional, and Academic Needs." This competitive preference priority asked applicants to address how their proposed SSS projects would meet the social, emotional, and academic needs of students, including underserved students, and be inclusive with respect to race. *See* 2024 NIA, 89 Fed. Reg. at 35,080. The second competitive preference priority, "Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success," asked applicants to address how their projects would increase postsecondary access, affordability, completion, and success for underserved students. *See* 2024 NIA, 89 Fed. Reg. at 35,081. The 2024 NIA defined an "underserved student" to include "[a] student of color." *Id.*

The Department's Application Package directed applicants to submit a response to the GEPA Equity Directive. *See* Application Package, *supra* n.10, at 63, 77. The Department emphasized that GEPA "allows applicants discretion in developing the required description. The statute highlights six types of barriers that can impede equitable access or participation: gender, race, national origin, color, disability, or age." ED, GEPA Notice to All Applicants.[11] In 2022, the Department revised its previous GEPA Equity Directive to conform with President Biden's Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government." *See* Agency Information Collection Activities; Comment Request; GEPA Section 427 Guidance for All Grant Applications, 87 Fed. Reg. 47,733 (Aug. 4, 2022).

The Affected Programs submitted timely Applications to the Department in 2024. All their Applications addressed the selection criteria, all their Applications contained the mandatory GEPA Equity Directive, and many of their Applications addressed the two competitive preference

---

[11] *Available at* https://www.ed.gov/media/document/general-education-provisions-act-gepa-requirements-section-427-ed-gepa-427-formpdf-11063.pdf.

priorities. Their Applications, as required, also contained an assurance of compliance with federal civil rights laws, including Title VI. *See* 34 C.F.R. § 75.500; 34 C.F.R. §§ 100.4, 104.5, 106.4, 108.8, and 110.23. The peer review evaluation and scoring process, as adjusted by the Secretary for any prior experience points, took place between late 2024 and was completed in early 2025.

## B.  The Trump Administration's new policies and priorities

President Trump assumed office on January 20, 2025. The President soon issued multiple Executive Orders critical of diversity, equity, and inclusion practices. *See* Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025) ("**EO 14173**"); Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ("**EO 14151**") (EO 14173 and EO 14151 collectively, the "**DEI Executive Orders**"). The DEI Executive Orders instructed the Department to identify "grantees who received [f]ederal funding to provide or advance DEI" and to "terminate . . . all . . . 'equity-related' grants." The Executive Branch also declared its plan to close the Department and reduce federal spending on education. *See* Exec. Order No. 14242, *Improving Education Outcomes by Empowering Parents, States, and Communities*, 90 Fed. Reg. 13,679 (Mar. 20, 2025) ("**EO 14242**").

Subsequently, the Department targeted TRIO programs. In the Department's fiscal year 2026 budget request, the Department proposed eliminating funding for all TRIO programs, explaining that:

> The Administration does not request funding for the Federal TRIO programs for fiscal year 2026, $1,191 million less than the fiscal year 2024 appropriation. Elimination of this program is part of the Administration's overall effort to restore fiscal discipline and reduce the Federal role in education. TRIO has failed to meet the vast majority of its performance measures, and studies of program effectiveness have shown that it has not increased college enrollment. States, localities, and institutions of higher education, not the Federal government, are best suited to determine whether

> to support the activities authorized under this program or similar activities within their own budgets and without unnecessary administrative burden imposed by the Federal government.

FY 2026 Budget Request, *supra* n.4, at 86. Likewise the U.S. Office of Management and Budget ("**OMB**") wrote to the Chair of the Senate Appropriations Committee that President Trump was recommending eliminating all TRIO funding in fiscal year 2026. *See* Letter from Russell Vought, Director of OMB, to the Hon. Susan Collins, Chair, Senate Committee on Approps. (May 2, 2025).[12] OMB identified TRIO as a "relic of the past when financial incentives were needed to motivate Institutions of Higher Education (IHEs) to engage with low-income students and increase access," and declared that "[t]oday, the pendulum has swung and access to college is not the obstacle it was for students of limited means." *Id.* It therefore urged the Appropriations Committee to commit to the President's "renewed focus on academics and scholastic accomplishment by IHEs, rather than engaging in woke ideology with Federal taxpayer subsidies." *Id.*

As part of the Administration's overall effort to reduce federal funding on grant programs out of line with its "core mission," the Department on May 21, 2025 announced new proposed priorities and definitions for use in the grantmaking process. *See* 90 Fed. Reg. 21,710 (May 21, 2025) ("**2025 Proposed Priorities**"). The 2025 Proposed Priorities *themselves* are not particularly relevant here. But they are relevant because they "intended to replace the [2021 Final Priorities]." *Id.* Critically, the Department acknowledged that its proposed "replace[ment]" of the 2021 Final Priorities would not apply retroactively. It explained that "those [2021 Final Priorities] ***remain in effect*** for notices inviting applications (NIAs) published before the [Department] finalizes the proposed priorities in this document." *Id.* (emphasis added).

---

[12] *Available at* https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

Following an abbreviated public comment process, the Department finalized the new priorities and definitions and published them in the Federal Register on September 9, 2025. Final Priorities and Definitions, 90 Fed. Reg. 43,514 (Sept. 9, 2025) ("**2025 Final Priorities**"). The 2025 Final Priorities become effective October 9, 2025. *Id.* In addressing its desire to rescind the 2021 Final Priorities, the Department stated:

> These priorities do not change the enforcement of Federal civil rights laws. Rather, it is necessary to repeal the 2021 priorities because they encourage recipients to violate Federal civil rights law—particularly Title VI of the Civil Rights Act of 1964—by using race-based preferences and stereotypes, and racial exclusion in their programs and to use Federal funds to promote or endorse gender ideology and political activism.

### C.      The Department denies the Affected Programs' Applications

In or around July 2025, the Department notified applicants for new SSS grants whether their applications were evaluated and selected for funding. Nine hundred sixty-two (962) applicants who earned a score of 113.3 points or higher were selected during the first slate of new SSS awards. *See* COE Decl., Ex. A. The Department obligated $313,547,951 towards this first slate of grantees. *See id*. The Department then notified an unknown number of other applicants that they scored below 113.3 points, but above 112 points, and thus in the "funding band" and were eligible to request secondary review. *See id*. The Department provided these applicants, and those that scored below 112 points, their peer-reviewed applications and final scores. *See id*.

The Department also notified the Affected Programs that their Applications had been "examined" but ultimately had "not been selected based on the Department's review for potential conflicts with applicable nondiscrimination requirements." Green River Decl. ¶¶ 27, 29; Big Bend Decl. ¶27; SIU-Carbondale Decl. ¶29. The Department did not inform the Affected Programs of their scores, did not provide them with their peer-reviewed applications, and stated that they were not eligible to request secondary review.

The Department's letter to every Affected Program is virtually identical. The Department stated that unidentified "staff" had examined their Applications and determined that they were "inconsistent with applicable nondiscrimination statutes, regulations, policies, and other requirements applicable to the program." Specifically, the letters stated that the Department:

> identified information indicating that the proposed activities take account of race in ways that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law. [citation to page number of application omitted]. The application is therefore inconsistent with applicable nondiscrimination statutes, regulations, policies, and other requirements applicable to the program. 34 C.F.R. § 75.500; see also 2 C.F.R. § 200.211(c). Therefore, the Department has not recommended your application for selection.

Green River Decl., Ex. F ; Big Bend Decl., Ex. B ; SIU-Carbondale Decl., Ex. B. The letters to all Affected Programs differ only in the page number cited in the Application. Green River Decl., Ex. F; Big Bend Decl., Ex. B; SIU-Carbondale Decl., Ex. B. The letters stated that Affected Programs could not seek secondary review under 34 C.F.R. § 646.24:

> Please note that the Department's determination of potential compliance with the nondiscrimination provisions of 34 C.F.R. § 75.500 is not subject to the secondary review procedures outlined in 34 C.F.R. § 646.24 for mathematical errors or errors in the peer review process.

See id. Nevertheless, the letters invited Affected Programs to contact the Department if they felt "this determination was made in error." Id. Affected Programs did contact the Department, explaining the agency's "errors," and also requested their peer-reviewed applications and final scores.[13] The Department has not responded to the Affected Programs. See Green River Decl. ¶34; Big Bend Decl. ¶32; SIU-Carbondale Decl. ¶34.

---

[13] In Big Bend's denial letter, the Department cited page "e100," but the Application only had 65 pages. When Big Bend inquired about this clear mistake, the Department ignored the inquiry. See Big Bend Decl., Ex. C.

Prior to issuing the denial letters in July 2025 that stated the Affected Programs' "activities take account of race," the Department neither informed the Affected Programs about Title VI noncompliance concerns nor sought their "voluntary compliance" with Title VI. *See* Green River Decl. ¶28; Big Bend Decl. ¶26; SIU-Carbondale Decl. ¶28. The Department's letters also did not say that the Department determined that their voluntary compliance was unfeasible. *See* Green River Decl. ¶26; Big Bend Decl. ¶28; SIU-Carbondale Decl. ¶28.

As a result, the Affected Programs are unable to seek review from the Department and are unable to provide services under their SSS projects which they had been operating. *See* Green River Decl. ¶36; Big Bend Decl. ¶32; SIU-Carbondale Decl. ¶37. Affected Programs instead have been laying off staff and employees, and students at their institutions who had been receiving support and would have continued to participate in their SSS projects are not receiving help. *See* Green River Decl. ¶¶36-38; Big Bend Decl. ¶¶32-24; SIU-Carbondale Decl. ¶¶37-39.

## ARGUMENT

## I. COE has demonstrated a substantial likelihood that it has both organizational and associational standing to sue.

Organizations—like COE—have two routes for establishing standing: asserting an injury to their members (associational standing) or asserting its own injury (organizational standing). *See Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). As discussed herein, COE has both organizational and associational standing.

### A. COE has organizational standing to sue

To have standing "in its own right," an organization must make "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (citations omitted).

"To demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)).

In *FDA v. Alliance for Hippocratic Medicine*, the Supreme Court recently restated the *Havens* holding as requiring "actions [that] directly affected and interfered with [an organizational plaintiff's] core businesses activities."[14] 602 U.S. 367, 395 (2024). The D.C. Circuit has interpreted *Havens* as instituting "two important limitations." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (internal quotations omitted).[15] "First, the plaintiff must show that the defendant's action or omission to act injured the organization's interest. Second, the plaintiff must show that it used its resources to counteract that harm." *Id.* (internal quotations omitted).

Here, first, COE has a pocketbook injury as a result of the Department's unlawful actions: the Affected Programs are closing down, and the dues they once paid to COE will no longer be paid without relief. *See* COE Decl. ¶¶41–42; *see*, *e.g.*, *Nat'l Treasury Emps. Union v. IRS*, No. 04-cv-0820, 2006 WL 416161, *2 (D.D.C. Feb. 22, 2006); *see also MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F. Supp. 3d 89, 101 (D.D.C. 2024) ("'[P]ocketbook injuries' are 'prototypical form[s] of injury in fact'") (citing *Collins v. Yellen*, 594 U.S. 220 (2021)). In addition, COE's organizational purpose and core business activities have been frustrated by the Department's denial of these Applications. COE is the sole national membership organization for

---

[14] The Supreme Court also stated this requirement is "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." 602 U.S. 367, 395 (2024).

[15] Other courts in the District of Colombia have recently questioned whether a plaintiff is still required to show the use of resources to counteract harm after the Supreme Court's ruling in *Alliance for Hippocratic Medicine*. *See Refugee and Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 1:25-cv-306-RDM, 2025 WL 1825431, at *22 n.7 (D.C.C. July 2, 2025). COE will assume that the Supreme Court did not intend to broaden the scope of organizational standing. See *Alliance for Hippocratic Med.*, 602 U.S. at 396 ("*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context.").

TRIO grantees, specifically here, for SSS grantees, and its day-to-day business activities include providing professional development and experiential learning opportunities to educators working in and students served by these programs. *See* COE Decl. ¶14. The Department's abrupt and unlawful change of position has caused COE to expend additional resources on new counseling and training to SSS programs as to the Department's new policies. *Id.* ¶¶43–44. Also, the Department has discontinued COE's own Staff Training grant that funded its training of SSS program staff; the Department's discontinuation was based on its same unlawful new policies that it invoked to deny the Affected Programs' Applications, and it has affected COE's core business activities of training SSS program staff. *Id.* ¶45. These injuries go beyond an "abstract social interest" and constitute more than just a "setback" to COE's interests. *See Havens*, 455 U.S. at 379 (distinguishing injury to an "organization's activities," which would satisfy standing elements, from "a setback to the organization's abstract social interests"). Rather, coupled with the Department's hostility to the TRIO programs, the Department's denial of the Applications—in complete disregard of both the authorizing statutes and applicable regulations—poses the precise type of existential threat that COE exists to counter. The Department's action imperils the very heartbeat of COE's mission with respect to SSS programs. *See* COE Decl. ¶43.

Second, COE has dedicated a significant amount of resources to counteract the harm caused by the Department's arbitrary and capricious denials of the Affected Programs' Applications. Since the Affected Programs received the denial letters, COE has been in daily contact with them and all other SSS program members regarding the status of their grants. *See* COE Decl. ¶¶40-41. COE has diverted resources from its core business activity of supporting TRIO programs and students in order to address the Department's unlawful action. COE Decl. ¶ 44. Accordingly, COE satisfies the requirements for organizational standing.

**B.      COE has associational standing to sue**

Even in the absence of injury to itself, an association may have standing by showing a cognizable injury to one or more of its members. "To show associational standing, an organization must demonstrate that: '(1) at least one of its members would have standing to sue in his own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted, nor the relief requested, requires that an individual member of the association participate in the lawsuit.'" *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333, 342–43 (1977)).

The first two *Hunt* prongs are constitutional, and the third is prudential. *United Food & Commercial Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 555–57 (1996). Only one member needs individual standing for an organization to satisfy the first *Hunt* factor. *See Am. Library Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005) (to meet associational standing, "at least one member [] must satisfy the three elements [injury-in-fact, causation, and redressability]").

"To establish standing, a plaintiff must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant; and (iii) that the injury likely would be redressed by the requested judicial relief." *Alliance for Hippocratic Med.*, 602 U.S. at 380 (internal quotations omitted).

Here, not just "one," but all the Affected Programs have standing. There is no question they have suffered "injury" that was "caused by" the Department's action. For example, Big Bend Community College operated an SSS program under a grant that expired on its own terms on August 31, 2025. *See* Big Bend Decl. ¶14. Big Bend therefore applied for a new grant in 2024 that, if awarded, would have begun September 1, 2025. On July 16, 2025, however, Big Bend received notice that its Application was not selected for funding based on "potential conflicts with

- 17 -

applicable nondiscrimination requirements." *Id.* ¶27. As a result, Big Bend's SSS program will cease to operate. *Id.* ¶34.

Other Affected Programs are in a similar situation. Green River College has not been able to serve the 200 students who had enrolled in its SSS program for the 2025-2026 academic year due to the denial of its Application. Green River Decl. ¶¶26, 36. Affected Members also face closures and layoffs. Big Bend will be forced to lay off staff if funds are not disbursed. *See* Big Bend Decl. ¶36. Green River will also be forced to lay off staff members. *See* Green River Decl. ¶¶36, 38.

Second, the interests that COE seeks to protect through this action are not simply "germane" to its purpose but are central to it. COE's core mission is the viability and success of its members' TRIO projects. That mission is *the* reason COE was formed. *See* COE Decl. ¶¶12-14. And without funding, the Affected Programs' SSS projects will cease to exist. *See* Green River Decl. ¶¶36; Big Bend Decl. ¶32; SIU-Carbondale Decl. ¶37. COE's interests threatened by the Department's arbitrary denial of their Applications are as "germane" to its purpose as can be.

Third, nothing about the claims being asserted and the relief requested by COE requires the individual Affected Members to participate as plaintiffs. All the Affected Members are in the same situation—their Applications for the same grant program were denied by the Department through an identical form letter. Enjoining the Department as COE requests will equally offer all the Affected Members complete relief. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986) (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)) (reasoning that this requirement is met where "the remedy, if granted, will inure to the benefit" of members). Accordingly, their participation as plaintiffs is not necessary. *See Harris Cnty. v. Kennedy*, 1:25-cv-1275-CRC, 2025 WL 1707665, at *3 (D.D.C. June 17, 2025)

(associational standing satisfied in grant termination case and participation by members not required because the "association seeks prospective or injunctive relief for its members.") (quoting *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996)). COE thus satisfies the requirements for associational standing.

## II.    The Court has jurisdiction over COE's claims.

As always, the Court must have jurisdiction over the claims at issue. Here, the Court has jurisdiction through the APA's waiver of sovereign immunity and through Title VI's waiver of sovereign immunity.

### A.    The APA's waiver of sovereign immunity

"[T]here is no dispute that the APA unambiguously waives sovereign immunity for non-monetary claims." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830 (D.C. Cir. 2024) (citing 5 U.S.C. § 702). The APA's waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). Here, COE is seeking specific injunctive relief—not monetary damages—and no other statute expressly or impliedly forbids this injunctive relief.

### B.    The Tucker Act does not bar COE from bringing these claims in this Court.

The Supreme Court recently addressed the extent to which a federal court has jurisdiction *over challenges to terminations of existing grants*. Those cases are distinguishable because this case does not involve existing grants, but rather denials of applications for new grants.

First, in *California v. Department of Education* ("*California*"), the Supreme Court stayed enforcement of a district court's temporary restraining order that required the government to pay past-due grant money as well as to resume ongoing grant obligations as they accrued. 145 S. Ct. 966, 968 (2025). Then, in *NIH v. American Public Health Association* ("*APHA*"), the Court

expressly stated that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money'" pursuant to those grants. 145 S.Ct. 2658, 2659 (2025) (quoting *California*, 145 S.Ct. at 968).

These two cases are distinguishable because both involved grant terminations, not (as here) denials of grant applications. Accordingly, the Supreme Court's holding and the Tucker Act's waiver of sovereign immunity does not apply. COE does not seek an order "to enforce a contractual obligation to pay money" as there is no existing grant or contract. *California*, 145 S. Ct. at 968. The claims are not based on "any express or implied contract with the United States," as there is no express or implied contract or any grant because the Applications were denied. *Id.* (citing 28 U.S.C. § 1491(a)(1)). "The Tucker Act . . . does not create substantive rights. A plaintiff relying on the Tucker Act must premise her damages action on 'other sources of law,' like 'statutes or contracts.'" *Maine Community Health Options v. United States*, 590 U.S. 296, 322 (2020) (quoting *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009)). For that reason, "'[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act.'" *Id.* (quoting *United States v. Mitchell*, 463 U.S. 206, 216 (2020)) (alteration in original).[16] "Nor will every 'failure to perform an obligation . . . creat[e] a right to monetary relief' against the Government." *Id.* (quoting *United States v. Bormes*, 568 U.S. 6, 16 (2012)).

Unlike in the aforementioned cases, the Affected Programs that COE brings this action on behalf of simply do not have grants (or contracts) with the Department, and this action is not about grant "termination." The Affected Programs submitted Applications in 2024 that the Department

---

[16] In *Maine Community Health*, the Supreme Court recognized that "so-called money-mandating provisions are uncommon" and the statute at hand was "one of the rare laws permitting a damages suit in the Court of Federal Claims." *Maine Community Health*, 590 U.S. at 324.

denied in 2025, and the Affected Programs' previous SSS grants have expired. The Supreme Court's reasoning in *California* and *APHA* relied on the existence of a grant that the Court analogized to a contract, fitting in with the Court's broader Tucker Act jurisprudence. *See APHA*, 145 S. Ct. at 2665 (Kavanaugh, J., concurring) ("The core of plaintiffs' suit alleges that the Government unlawfully terminated their grants. That is a breach of contract claim."). Justice Barrett aptly acknowledged this distinction, noting: "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *APHA*, 145 S.Ct. at 2661 (Barrett, J., concurring). And in *California*, the *per curiam* majority stated, "[t]rue, a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *See* 145 S. Ct. at 968.

That *possibility* is precisely what exists here. There is a possibility that the Department may disburse funds to the Affected Programs once the Department, not the Court, reconsiders the Applications and awards new grants based on the final scores the Affected Programs already received (but have not received), the 2024 NIA, and the law. In *APHA*, Chief Justice Roberts, Justice Sotomayor, Justice Kagan, and Justice Jackson all would have ruled that such "relief— which has prospective and generally applicable implications beyond the reinstatement of specific grants—falls well within the scope of the District Court's jurisdiction under the Administrative Procedure Act." *APHA*, 145 S. Ct. at 2663 (Roberts, C.J., concurring in part and dissenting in part). And Justice Barrett, as discussed above, expressly stated her view that "the Government is not entitled to a stay of the judgments insofar as they vacate the guidance documents" because the order with respect to vacating guidance did not necessarily lead to the payment of funds. *Id.*

at 2661. The same situation exists here. Accordingly, the place for this case is here in this Court, not the Court of Federal Claims.

## C.    Title VI's waiver of sovereign immunity

Even if the Supreme Court's rulings in *California* and *APHA* apply to these grant application denials, which they do not, Title VI provides a separate basis for jurisdiction that the Supreme Court did not opine on in either case. In April 2025, the Trump Administration froze $2.2 billion in grant funding to Harvard University based on its purported failure to address antisemitism in addition to its diversity, equity, and inclusion policies. *See Harvard Has $2.2 Billion in Grants Frozen by Trump Administration After Rejecting Demands*, CNBC (Apr. 15, 2025).[17] After Harvard sued over the freeze, the district court found it had jurisdiction, the Tucker Act notwithstanding, and it distinguished *California* and *APHA* for three reasons. *See President & Fellows of Harvard Coll. v. U.S. Dep't of HHS ("Harvard v. HHS")*, No. 25-cv-10910, 2025 WL 2528380, at *12–13 (D. Mass. Sept. 3, 2025).

First, the court explained that claims pertaining to rights under Title VI "do not ordinarily fall within the ambit of the Tucker Act," such that the Tucker Act's waiver of sovereign immunity was not relevant and that Title VI separately authorizes judicial review.[18] *Id.* at *13. Second, Harvard sought relief beyond the simple enforcement of a monetary obligation; it sought prospective relief mandating that the Administration comply with Title VI's strict procedural requirements. *Id.* Third, Harvard's claims could not be "split," as in *APHA*, because the court said it would be procedurally unworkable. *Id.* at *13.

---

[17] *Available at* https://www.cnbc.com/2025/04/14/trump-harvard-deal-funding-billion-dei.html.

[18] *See* discussion *supra* Section I.F; *see also Colwell v. Dep't of HHS*, 558 F.3d 1112, 1128 (9th Cir. 2009) ("Judicial review of any [Title VI] funding termination is available in an Article III court."); *Adams v. Bell*, 711 F.2d 161, 189 (D.C. Cir. 1983) (Wright, J., dissenting) (noting that "the traditional mode" for review under 42 U.S.C. § 2000d-2 is "the APA").

This reasoning applies with even more force here. First, as was the case in *Harvard v. HHS*, COE's claims over the Department's Title VI noncompliance fall within the framework of the APA, and accordingly, belong in an Article III court. *See* 42 U.S.C. § 2000d-2. Second, COE's requested relief is *purely* prospective injunctive relief. There is *no* monetary "obligation" at issue here as the Affected Programs were denied new grants; they did not have existing grants terminated. Third, there are no claims to "split." As discussed above, COE has no cause of action to assert in the Court of Federal Claims because its claims relate to the Department's denials rather than a monetary obligation such as a grant or contract.

### D.    The *Larson-Dugan* exception to sovereign immunity

Separately from the APA claims, this Court has jurisdiction over COE's *ultra vires* claim. Under the *Larson-Dugan* exception to sovereign immunity, a plaintiff can assert a constitutional claim against an executive officer acting outside the bounds of the Constitution or their statutory authority. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963). As the Supreme Court explained in *Larson,* such a waiver is unnecessary because, when an officer acts beyond the limits set by statute or the Constitution, "his actions beyond those limitations are considered individual and not sovereign actions." 337 U.S. at 689; *see also Pollack v. Hogan,* 703 F.3d 117, 120 (D.C. Cir. 2012) ("Under this exception, suits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity.").

### III.    COE has satisfied all the requirements for the Court to issue a preliminary injunction.

### A.    COE has established a likelihood of success on the merits

"In this circuit, it remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors

strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 393, 398 (D.C. Cir. 2011)). In this case, COE has shown that there is at least a serious legal question on the merits.

### 1.    The APA and final agency action

Section 706 of the APA provides in part that "[t]he reviewing court shall": . . .

> hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B)    contrary to constitutional right, power, privilege, or immunity;
> (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D)    without observance of procedure required by law . . . .

5 U.S.C. § 706(2). For purposes of these claims, the Department's denial of the Affected Programs' Applications is final agency action subject to challenge under § 706(2). An agency action is "final" if: (1) it marks the "'consummation' of the agency's decision making process," and (2) determines rights or obligations or creates legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Courts have called for a "pragmatic" approach in analyzing finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599–600 (2016) (citation omitted).

There can be little dispute that the Department's denial letters constitute final agency action. The Affected Programs submitted Applications that the Department denied. The Department expressly stated that the Affected Programs could not seek secondary review under 34 C.F.R. § 646.24. Per the Department's regulations, "[t]he Secretary's determination of whether the applicant has met the requirements for a second review and the Secretary's decision on re-scoring of an application are final and not subject to further appeal or challenge." 34 C.F.R.

§ 646.24(e). Moreover, the Department never responded to Affected Programs that sought to initiate a discussion regarding the errors in the denial letters.

> **a.** **Contrary to law, in excess of statutory authority, and without observance of procedure under 5 U.S.C. § 706(2)(A), (C), and (D) (Counts I, III, and IV)**

COE is likely to succeed on its APA claims based on the Department's failure to follow the APA's command prohibiting agency action in excess of authority, contrary to law, and without observance of procedure required by law. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). An agency acts "contrary to law" when it fails to engage in notice-and-comment procedures "explicitly required" by Congress. *See Michigan v. EPA*, 268 F.3d 1075, 1088–89 (D.C. Cir. 2001) ("In making such determinations EPA must use notice and comment proceedings. . . . Because Congress's intent is clear, EPA's proposed approach [to use adjudications instead of rulemaking] is simply contrary to law."). "Failure to adhere to a notice-and-comment rulemaking requirement is an action not 'made in observance of procedure required by law.'" *See Elev8 Baltimore v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1458, 2025 WL 1865971 (D. Md. July 7, 2025) (quoting *HLI Lordship Indus. v. Comm. for Purchase from the Blind & Other Severely Handicapped*, 791 F.2d 1136, 1140 (4th Cir. 1986)).

Here, the Department violated the APA because it failed to follow Title VI's procedures before refusing to grant financial assistance to the Affected Programs, it improperly denied Applications for addressing competitive preference priorities in the 2024 NIA and for supplying the mandatory GEPA Equity Directive, and because it unlawfully grounded the denials on new policies that had not undergone notice-and-comment rulemaking in violation of GEPA and the APA.

i.      **The Department failed to follow the required procedures to deny grant funding under Title VI.**

The Department is required to follow very specific procedures under the law *before* denying grant funding to an applicant on the basis of a Title VI violation. *See* discussion *supra* Background § I.F; 34 C.F.R. § 75.500; 34 C.F.R. Part 100.

The Department followed none of these requirements here. None of the Affected Programs were contacted by the Department before receiving the July 2025 letters denying their Applications. The Department thus never attempted to seek the Affected Programs' voluntary compliance with Title VI, and further, the Department never determined that their voluntarily compliance was not possible. *See* 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.6; 34 C.F.R. § 100.8(c). Because the Department never contacted the Affected Programs, the Department necessarily never provided them an opportunity for a hearing, and accordingly, never made any express finding on the record that any of the Affected Programs failed to comply with Title VI. *See* 34 C.F.R §§ 100.9(b), 100.10; *id.* § 100(c)–(d). And the Affected Programs do not believe that the Department, through the Secretary, ever filed a full written report of the circumstances and the grounds for denying the Applications with the Senate Committee on Health, Education, Labor, and Pensions or the House Committee on Education and the Workforce. In sum, the Department ignored the Title VI's requirements, implemented by 34 C.F.R. Part 100, from top to bottom. Consequently, the Department acted contrary to law, in excess of statutory authority, and without observance of procedure. COE is likely to succeed on this claim.

ii.     **The Department evaluated the Applications using the wrong priorities.**

Federal regulations require the Department to publish a notice of invitation in the Federal Register that includes the selection criteria and any priorities that applicants for grants will be evaluated and scored against. *See* 34 C.F.R. § 646.20–22; *id.* § 75.200; *id.* § 217. The Department

then "shall award grants . . . in the order of the scores received by the application for such grant or contract in the peer review process . . . and adjusted for prior experience." 20 U.S.C. § 1070a-11(c)(3).

The 2024 NIA, published in the Federal Register, contained two competitive preference priorities, but the Department did not treat them as priorities when later denying the Affected Programs' Applications in 2025. If it had, the Department likely would have awarded new grants to the Affected Programs that successfully addressed them. Instead, the Department relied on a new "policy of prioritizing merit, fairness, and excellence in education," even though this policy appears nowhere as a "priority" in the 2024 NIA. Thus, for this reason alone, the Department acted contrary to law, in excess of statutory authority, and without observance of procedure.

### iii. The Department failed to follow statutorily-required notice-and-comment for its new policies.

In the Department's letter denying the Applications, it explained that the Affected Programs' proposed SSS project activities "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." Again, this "policy" appears nowhere in the 2024 NIA, and this policy had been not been published in the Federal Register when the Affected Programs applied in 2024. The Department had to follow APA notice-and-comment rulemaking procedures to set any priorities *before* publishing the 2024 NIA (which it did with the 2021 Final Priorities) and *before* it could treat a new policy as a factor when awarding new grants (which it did not with its new policies). GEPA leaves the Department no discretion to casually ignore the APA's rulemaking procedures. *See* 20 U.S.C. § 1232(d). The Department elsewhere has admitted as much. In *U.S. Dep't of Educ. v. Am. Ass'n of Colls. for Teacher Educ.*, currently pending before the Fourth Circuit, the Department stated: "While plaintiffs are correct that this list of priorities

can only be changed by notice-and-comment rulemaking . . . ." No. 25-1281, ECF Doc. 39, 2025 WL 2376288, at *19 (Aug. 6, 2025).

Because the Department did not follow the notice-and-comment requirements, the application of its new policy to deny the Applications was unlawful, and the policy itself must be vacated. *See AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 84 (D.D.C. 2007) ("The APA puts the agency to a simple either/or choice: either notice-and-comment procedures or the good-cause exception."); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule."); *Mack Trucks v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012).

### iv.    The Department retroactively applied the 2025 Final Priorities.

Although the 2024 NIA contains competitive preference priorities that were published as part of the 2021 Final Priorities, the Department prematurely invoked its new 2025 Final Priorities—which proposed to rescind the 2021 Final Priorities—to deny the Applications. The 2025 Proposed Priorities were obviously not in place in 2024 when the Affected Programs applied, and moreover, they still were not in place when the Department denied the Applications in July 2025. The Department specifically admitted that it would treat its planned rescindment of the 2021 Final Priorities *prospectively* to *future* competitions, stating that "those [2021 Final Priorities] **remain in effect** for notices inviting applications (NIAs) published before the [Department] finalizes the proposed priorities in this document." 90 Fed. Reg. 21,710.

The 2025 Proposed Priorities simply could not "rescind" the 2021 Final Priorities retroactively; that would turn the grantmaking process on its head. "An administrative rule is retroactive if it 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or

considerations already past.'" *Id.* (quoting *Nat'l Mining Ass'n v. Dep't of the Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999); *Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 2322763, at *18 (W.D. Wash. 2025) (ordering that HUD "may not retroactively apply such conditions to grant agreements during the effective period of this preliminary injunction"). That is precisely what the Department did here and what it could not do without authorization from Congress. "[A]n agency may not promulgate 'retroactive' rules without express authorization from Congress." *See Cox v. Kijakazi*, 77 F.4th 983, 991 (D.C. Cir. 2023).

The 2025 Proposed Priorities are retroactive because they penalize the Affected Programs' Applications for responding to the competitive preferences that the 2024 NIA asked for.

### v.    The Department failed to provide secondary review.

SSS's authorizing statute and the Department's regulations require an applicant to be able to seek "secondary review" of its rejected grant application. *See* 20 U.S.C. § 1070a-11(8)(C)(i); 34 C.F.R. § 646.24(a)–(c). Here, the Department refused to afford the Affected Programs the opportunity to seek secondary review, claiming that its "determination of potential compliance with the nondiscrimination provisions of 34 C.F.R. § 75.500 is not subject to the secondary review procedures." This statement is unsupported by any regulation or law, and it is inconsistent with the way Title VI operates.

For these five reasons, the Department's denial of the Applications is contrary to law, in excess of statutory authority, and it acted without observing proper procedure.

### b.    Arbitrary and capricious agency action (Count II)

In addition to being contrary to law, in excess of statutory authority, and without observance of procedure, a number of the Department's actions are arbitrary and capricious. The APA "requires agencies to engage in 'reasoned decisionmaking,' and directs that agency actions

be 'set aside' if they are 'arbitrary' or 'capricious.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (internal citations omitted). *see also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.").

Here, the Department's actions are arbitrary and capricious for two primary reasons. First, the Department relied on factors—its new "policies"—that it was not entitled to consider when deciding the Applications and it provided no reasoned explanation. Second, the Department suddenly changed its position regarding the competitive preference priorities with no explanation.

### i. The Department relied on improper factors when deciding the Affected Programs' Applications and gave no explanation.

An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, the Department plainly relied on factors that Congress did not intend for it to consider. The Department stated itself in the denial letters that its decision was based on a policy that is not in the 2024 NIA. In any event, the Department offered no explanation for how or why the Affected Programs did not meet this new policy. No letter says how any one Affected Program purportedly violated "federal civil rights law"; indeed, each letter is practically the same. The Department's citation to a single page in the Applications is simply not enough to deny an application for a new grant, and especially when the denial is based on claims of race discrimination.

And insofar as the Department denied the Applications for language contained in their GEPA Equity Directives, that is inherently arbitrary and capricious too. GEPA *requires* grant applicants discuss their plans to "ensure equitable access to" educational opportunities by addressing "special needs of students" to "overcome barriers," including "barriers based on "race." 20 U.S.C. § 1228a(b). The Department's "policy" treating statements in grant applications made in direct compliance with GEPA is unlawful itself. Put differently, the Department's new interpretation of Title VI leaves little daylight between that law and GEPA, and it is entirely unclear how to thread the needle between them. The only guidance that the Affected Programs got was from the Department in 2024 when it encouraged them to exercise "discretion" in complying with GEPA. ED, GEPA Notice to All Applicants, *supra* at p. 9,. The Department, now under a new Administration, cannot retroactively claw that guidance back.

### ii.     The Department changed its position with no explanation.

The "well-worn arbitrary-and-capricious standard ensures that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917–18 (2025) (quoting *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43. Under the "change-in-position doctrine . . . agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)) (cleaned up).

Here, the Department changed its position by abandoning the priorities in the 2024 NIA and by adopting the new, unarticulated policies expressed in the denial letters. Perhaps because it failed to follow the proper procedures, *see supra* Section § III.A.1.a, it gave no reasoning

whatsoever for this change, and in fact, did not even acknowledge it. "[D]eparture from [past] practice, with no explanation, renders its void *ab initio* rationale arbitrary and capricious." *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1335–36 (D.C. Cir. 2004. In changing its position, the Department impermissibly disregarded the competitive preference priorities that were published in the Federal Register and were in effect throughout the competition. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."); *see also Urb. Sustainability Directors Network v. U.S. Dep't of Agric.*, No. 1:25-cv-1775, 2025 WL 2374528, at *34–35 (D.D.C. Aug. 14, 2025) ("Although each termination letter offers a citation to § 200.340(a)(4) and mentions that the grant is not consistent with agency priorities, no letter explains *why* the particular grant is not consistent with the cited priorities and *why* the change in priorities justifies terminating an awarded grant on which plaintiffs have substantially relied," and "[t]he letters strongly suggest that defendants identified grants for the chopping block via a blunt keyword search, without much, if any, further inquiry.") (emphasis in original).

Similarly, the Department completely disregarded the Affected Programs' reliance interests in multiple ways. The first likely goes without saying: the Affected Programs necessarily relied on the priorities in the 2024 NIA because it outlined how applicants could receive grants. Further, the denial letters entirely overlook that the Affected Programs had previous SSS grants that expired on their own terms on August 31, 2025. Each Application was intended to continue an already-existing program. This interest in continuing programs is expressly recognized by the authorizing statutes for SSS programs and applicable regulations. 20 U.S.C. § 1070a-11 requires the Department to consider an applicant's prior experience when awarding new grants. 34 C.F.R. § 646.22 explains how the Department evaluates an applicant's prior experience. And 20 U.S.C.

§ 1070a-11(c)(7) requires the Department to inform each operating program regarding the status of an application for continued funding at least 8 months prior to the expiration of a grant specifically to "ensure that the start-up date for a new grant or contract for such program immediately follows the termination of the preceding grant or contract so that no interruption of funding occurs for such successful reapplicants." The Department's letter recognizes none of these interests, and accordingly, the denial decision is arbitrary and capricious.

### c.        Violation of constitutional rights under the APA (Count V)[19]

"Statutory language that an official 'shall' perform an act has been repeatedly held to be mandatory in nature. It deprives the official of discretion and makes the commanded act a duty, a ministerial act." *Com. of Pa. v. Weinberger*, 367 F.Supp. 1378, 1381 (D.D.C. 1973) (Commissioner of Education was required by statute to apportion to the states the full amount of appropriated funds for Parts A and C of Title V); *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d. 959, 991 (N.D. Ill. 2025) ("Congress expressly stated in the WANTO Act that the Executive "shall" award grants for projects impacting women."). The Executive Branch "does not have unilateral authority" to refuse to spend funds appropriated by Congress. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Indeed, it is axiomatic that "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

---

[19] Standalone constitutional claims are currently barred by D.C. Circuit precedent that treat a separation of powers claim as a statutory claim under *Dalton v. Specter*, 511 U.S. 462 (1994). *See Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *9 (D.C. Cir. Aug. 28, 2025) ("In sum, we conclude that *Dalton* controls this case and the grantees lack a cause of action to bring their freestanding constitutional claim."); *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *20 (D.C. Cir. Aug. 15, 2025) (analyzing constitutional claim under *Dalton*); *Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) (same). As the D.C. Circuit noted in *Global Health Council*, it created a circuit split with the Ninth Circuit. *See* 2025 WL 2480618, at *9 n.15. If this line of cases is reversed in the Supreme Court or by the D.C. Circuit *en banc*, COE respectfully requests leave to brief this issue.

Here, Congress appropriated at least $1.19 billion in federal fiscal year 2025 funds to the Department to carry out TRIO programs, including the SSS program. As noted earlier, due to the Department delaying the grant award for process for other TRIO programs into late September 2025, it is unclear at this time whether that amount has been properly obligated towards the TRIO programs. Insofar as unobligated funds remain available, however, the Department is required by law to spend them, and cannot avoid spending them merely by delaying action after the fiscal year. To the extent funds remain, they remain available for the purposes of awarding new grants to the Affected Programs that should already have been made. *See supra* n.3; *City of Houston*, 24 F.3d at 1426 ("[A] court may award funds based on an appropriation even after the date when the appropriation lapses, so long as the lawsuit was instituted on or before that date").

### 2.    Ultra vires (Count VI)

COE is also likely to succeed on its claim seeking *ultra vires* review of the Department's action, which is proper when (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim and (3) the challenged action is "plainly" in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). If this Court does not grant a preliminary injunction pursuant to COE's APA or standalone Constitutional claims, the Court should find that Department acted *ultra vires*, in excess of its statutory authorities under the HEA. "[T]he case law in this circuit is clear that judicial review is available when an agency acts *ultra vires*." *Nat'l Assoc. of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022).

### 3.    Writ of mandamus under 28 U.S.C. § 1361 (Count VII)

If this Court does not grant an injunction pursuant to the APA or *ultra vires* claims, COE requests, in the alternative, that the Court issue a writ of mandamus compelling the Department to act as required by law. "The preemptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967). A district court has original jurisdiction in the nature of mandamus only if (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff. *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022).

A court "can analyze the clear right for relief and clear duty to act requirements for mandamus concurrently." *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (cleaned up). "To meet the clear duty to act standard, the law must not only authorize the demanded action, but require it, *the duty must be clear and indisputable*." *Id.* (cleaned up, emphasis in original). In *Harris v. Bessent*, the court concluded that the plaintiff had a separate, adequate remedy—an injunction—so the request for mandamus failed. 775 F. Supp. 3d 164, 188 (D.D.C. 2025). But in denying the mandamus request, it noted, "Were equitable injunctive relief unavailable here, however, the Court would not hesitate to vigilantly enforce federal law and award necessary relief through a writ of mandamus as an alternative remedy at law." *Id.*

This case clearly meets the first two requirements for mandamus. It is unquestionable that the Department must score applicants based on the criteria and priorities published in the 2024 NIA and then make award decisions based on those scores. The Department cannot substitute priorities or institute new policies that have not gone through the requisite procedure. If the Court determines that COE's requested injunction is appropriate, it need not consider this mandamus claim. But if this Court does not enter an injunction, COE will have no alternative remedy at law.

COE and the Affected Programs deserve a remedy, given that the Applications simply responded to the Department's proposal as written. If an injunction is not available, this Court should issue a writ of mandamus.

**B.      COE will suffer irreparable harm without an injunction**

COE will suffer immediate and irreparable harm without an injunction. COE is the leading nonprofit membership organization in the United States for colleges and universities that participate in the federal TRIO programs. COE has a keen interest in the Department following the statutory and regulatory scheme that governs SSS and all other TRIO programs. COE Decl. ¶¶38-46. In recent months, COE has dedicated enormous time, money, and resources to ensure that the Department adheres to the governing law and regulations applicable to TRIO. *Id.* The Department's denial of the Affected Programs' Applications is anathema to the Department's duty to award grants to applications based on an "objective" review of their "merit" as opposed to political ideologies.

The Department's blatant disregard for the carefully constructed laws and regulations applicable to the SSS program, including but not limited to the evaluation and scoring of applications, the awarding of grants, and the opportunities for denied applicants to seek secondary review, is deeply troubling to COE and undermines its core mission. "The detriment to Plaintiffs' organizational missions . . . cannot be remedied through retroactive relief." *New York v. McMahon*, 784 F. Supp. 3d 311, 362 (D. Mass. 2025); *John T. v. Delaware Cnty. Intermediate Unit*, No. 98-cv-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000).

The harm to the Affected Programs is immediate. The 2025-2026 academic year has already begun and without immediate relief requiring the Department to reconsider their Applications in a lawful manner and to follow its procedures for awarding new grants, the Affected

Programs will be unable to offer SSS projects. *See* Green River Decl. ¶37 ("As, a result of ED's decision, Green River College will no longer be able to serve current SSS students; Big Bend Decl. ¶32; SIU-Carbondale Decl. ¶32. The Affected Programs have relied heavily, if not exclusively, on federal funding to operate their SSS projects for years. *See* Green River Decl. ¶36 ("Green River College relies exclusively on federal funding to operate its SSS project [and] to provide services to its project's participants"); *see* Big Bend Decl. ¶37; *see* SIU-Carbondale Decl. ¶37. Without the possibility of being awarded such funding following a lawful review process, the Affected Programs will be unable to continue operating their SSS projects as they have done for years. *See* Green River Decl. ¶37; Big Bend Decl. ¶37; SIU-Carbondale Decl. ¶37.

Critically, the Department has withheld the Affected Programs' final scores and their peer-reviewed applications. COE Decl. ¶33; Big Bend Decl., Ex. C. The Affected Programs have every reason to believe that they scored high enough—over 113.3 points—to have been selected for a new grant as required under the HEA. Indeed, for those applicants that did not score high enough to receive an award and did not score high enough to fall within the funding band, the Department *affirmatively* disclosed their scores and provided them their peer-reviewed applications. *See* COE Decl. ¶¶32–33; *id.* Ex. A. Had the Affected Programs not scored high enough to fall within the funding band, the Department necessarily would have told them that. *Id.* It did not. It stands to reason that the Affected Programs did score high enough to have been selected for an award or to at least be in the funding band. *Id.* ¶35. It is only because the Department unlawfully retroactively invoked new proposed priorities, penalized Affected Programs for complying with the GEPA Equity Directive, and failed to follow its Title VI procedures that they have not been awarded grants.

Critically, the evidence reveals that peer reviewers awarded points to applicants that successfully responded to the competitive preference priorities. *See* COE Decl. ¶37; *id.* at Ex. B. In other words, the Department treated some applicants in a way that is completely opposite from how it treated the Affected Programs. All applicants must be evaluated and scored according to the same selection criteria, priorities, and prior experience standards. Congress directed the Secretary to "ensure that the final score of an application, including prior experience points for high quality service delivery and points awarded through the peer review process, is determined in an accurate and transparent manner." 20 U.S.C. § 1070a-11(g). The scoring process here was blatantly inaccurate and inconsistent, and the Secretary has not been forthcoming about how it decided to both select and reject applicants for new grants.

All these unlawful actions preclude the Affected Programs from enjoying the opportunity to merely "compete" for a new grant. While the Circuit has recognized the lost opportunity to "compete for [] funds" as a form of injury, "if the later opportunity to compete for additional grants could fix the harm, it would not be irreparable." *Global Health Council*, 2025 WL 2480618, at *5, *13. Yet here, the Department wholesale denied the Affected Programs this opportunity. The Affected Programs are currently "ineligible" to even request secondary review. *See Am. Assoc. of Physc. Teachers v. Nat'l Sci. Found.*, No. 1:25-cv-1923, 2025 WL 2615054, at *14 (D.D.C. Sept. 10, 2025).

Not only will Affected Members be forced to shut down their SSS projects as a result of the Department's unlawful actions, but the denials will also have a long-lasting effect that reaches into the next grant competition in 2030.[20] First, the Affected Programs will be ineligible for prior experience points. COE Decl. ¶48. Prior experience points are only awarded to programs seeking

---

[20] In the past, the Department has run SSS grant competitions every five years. Because this competition was held for fiscal year 2025, the next competition should be for fiscal year 2030.

to "continue" an "expiring" grant. 34 C.F.R. § 646.20(a)(2)(i). When the Department invites applications during the next SSS grant cycle, the Affected Programs will not be seeking to "continue" an "expiring" SSS grant because the Department denied their Applications in 2025. COE Decl. ¶48. Consequently, they will be at a competitive disadvantage.

Second, the Affected Programs will be unable to seek an SSS grant award in the same amount as they had under their previous grants. COE Decl. ¶48. With respect to the amount of a possible grant award, the 2024 NIA separated applicants into two groups: applicants that at the time had existing SSS grants, and applicants that did not. *See* 2024 NIA, 89 Fed. Reg. at 35,082. For applicants without an existing SSS grant, the maximum award amount was $272,364, based on a different per-participant expected cost that depends on the specific type of SSS program. But for applicants that had a SSS grant, the maximum award amount was the greater of (a) $272,364 or (b) 100 percent of the applicant's base award amount for fiscal year 2024 up to a maximum amount of $1,659,366. *See* 2024 NIA, 89 Fed. Reg. at 35,082. Without an existing SSS grant at the time the next SSS competition is held, the Affected Programs will not be eligible for the amount they otherwise would have been. This, and the lack of prior experience points, are severe harms and "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Moreover, the harm to the Affected Programs extends beyond the inability to "compete" for a new grant, the inability to obtain federal funding, or even the long-lasting harms that may prevent the Affected Programs from being able to earn prior experience points and obtain greater funding in the next competition. As part of the denial decisions, the Department determined that the Affected Programs proposed to discriminate "on account of race" against students in violation of Title VI. This finding greatly damages the Affected Programs' reputations in their communities

and will impact their ability to recruit and attract new students to their institutions. "[P]eople and entities receiving federal funding are shielded against being labeled with the 'irreversible stigma' of 'discriminator' until a certain level of agency process has determined that there was misconduct that warranted termination." *Harvard v. HHS*, 2025 WL 2528380, at *29 (internal citations omitted). Instead of affording the Affected Programs a chance to voluntarily comply or giving the Affected Programs the due process required by Title VI, it instead branded these programs as discriminators without so much as a second look.

Finally, it barely needs be said that the denial of the Applications will cause irreparable harm to the Affected Programs' students that need support services. "The detriment to student education . . . cannot be remedied through retroactive relief." *New York v. McMahon*, 784 F. Supp. 3d at 362. Students need these programs to succeed in their postsecondary education. Without them, qualified students will be at a higher risk of dropping out. *See* Green River Decl. ¶39 ("[The] [l]ack of assistance navigating enrollment and registration policies and procedures, such as holds, appeals, and petitions, will have a direct negative impact on students' ability to stay enrolled" and "[s]tudents within one year of graduating will lose academic and college support to complete their degree decreasing their likelihood of transferring to a four-year degree program"); SIU-Carbondale Decl. ¶39 (noting the loss of specialized academic support services for vulnerable and generationally disadvantaged students).

On the other hand, the Department will suffer no harm from a Court order directing it to reconsider and act upon the Applications through a lawful process as required by the HEA and the Department's regulations. As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having

governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted).

### C.    The balance of equities favors COE

The balance-of-equities and public-interest factors merge if the government is the opposing party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, if the Court grants COE's requested relief, the Department will suffer no harm. It will reconsider the Applications and new grants to Affected Programs based on their previously-awarded scores, and afforded them the procedures required by law. The public interest in this injunction is particularly strong as the Affected Programs offer SSS programs to first-generation, low-income, and disabled college students—a group that Congress has determined needs assistance.

### D.    No bond should be required

This Court has discretion under Federal Rule of Civil Procedure 65(c) to waive the bond requirement for preliminary injunctions, particularly for nonprofit organizations serving the public interest. This discretion is not contradicted by the Supreme Court's rulings in *California* and *APHA*. Both those cases sought the restoration of funding. Here, COE seeks relief in the form of vacatur of the Department's decisions to deny the Affected Programs' Applications and reconsideration of the same. If the Department does ultimately disburse funds, such disbursement would only happen as a consequence of the Affected Programs' previously-determined scores.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter a preliminary injunction in COE's favor ordering the Department (and the Secretary) to vacate the denial decisions and immediately reconsider the Affected Programs' Applications, according to the final scores the Affected

Programs already received (but that have not been disclosed), the HEA, the Department's applicable regulations, the 2024 NIA, and GEPA, in addition to following proper procedures under Title VI.

Dated: September 30, 2025    Respectfully submitted,

**THOMPSON COBURN LLP**

/s/ Jayna Marie Rust
Jayna Marie Rust (D.C. Bar No. 998326)
1909 K Street N.W., Suite 600
Washington, D.C. 20006
P.    (202) 585-6929
E.    jrust@thompsoncoburn.com

Brandt P. Hill (*Pro hac vice* forthcoming)
Lorrie L. Hargrove (*Pro hac vice* forthcoming)
2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
P.    (205) 769-4303
E.    bhill@thompsoncoburn.com
      lhargrove@thompsoncoburn.com

*Attorneys for the Council for Opportunity in Education*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2025, I served the foregoing on all counsel of record using the Court's CM/ECF system or by U.S. Mail at the following addresses:

U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, DC 20202

Linda McMahon
U.S. Secretary of Education
400 Maryland Avenue, S.W.
Washington, DC 20202

Assistant Attorney General for Administration
U.S. Department of Justice
Justice Management Division
950 Pennsylvania Avenue, NW
Room 1111
Washington, DC 20530

United States Attorney's Office for the District of Columbia
Attn: Civil Process Clerk
Civil Division
601 D Street, N.W.
Washington, DC 20530

/s/ Jayna Marie Rust
Jayna Marie Rust
Thompson Coburn LLP
1909 K Street N.W., Suite 600
Washington, D.C. 20006
P.        (202) 585-6929
E.        jrust@thompsoncoburn.com